356 S.E.2d 181

**STATE ex rel. W.VA. DEPARTMENT OF HUMAN SERVICES**

**v.**

**CHERYL M., et al.**

No. 17156.

Supreme Court of Appeals of West Virginia.

April 2, 1987.

J. David Judy, III, Judy & Judy, Moorefield, for appellant.

Kenneth Knopf, Asst. Atty. Gen., Charleston, William Bean, Pros. Atty., Moorefield, for appellee.

MILLER, Justice:

Cheryl M. appeals from the final order of the Circuit Court of Hardy County which terminated her parental rights to her infant child, Amanda.[1] She assigns as error the trial court's retention of temporary custody of Amanda beyond statutory limits, the trial court's failure to allow a statutory improvement period, and the trial court's failure to adopt the least restrictive alternative that is appropriate to the circumstances.

Cheryl M. and Mark J. are the natural parents of Amanda, born July 19, 1983, in the State of Maine where her parents were residents.[2] In April, 1984, Cheryl and Amanda came to Wardensville, West Virginia, to see Mark, who was traveling with a carnival which was giving a performance in that area. The child abuse incident occurred during Cheryl's argument with Mark over his lack of monetary support.

The argument began at the motel where he was staying with his cousin and her husband who also worked for the carnival. They claimed that Cheryl dropped the baby while arguing with Mark. Cheryl claimed she placed Amanda on Mark's bed. The argument continued outside where Mark's relatives claimed Cheryl dropped Amanda. Cheryl stated she slipped on wet grass, fell, and the baby landed on top of her. The final incident occurred when she placed the baby on an open porch while still arguing with Mark and the baby rolled to the edge, but was caught by Mark.

Dr. Thomas Peck, examining Amanda at the DHS's request on the day of the incident, found a "well child physically" of average height and weight. He concluded, "I see no evidence on my exam to support that there has been significant injury from this abuse event." X-rays revealed no evidence of any acute or chronic trauma. A medical report submitted by Dr. E.R. Caldwell, III, of a May 21, 1984 examination stated that Amanda's growth and development were normal and her EEG was also found to be completely normal. The doctor concluded she appeared healthy and was social and smiling.

On April 28, 1984, after this incident, the West Virginia Department of Human Services (DHS), was called and took physical custody of Amanda. A petition requesting temporary custody filed later that day was granted by the Circuit Court of Hardy County.[3] The DHS in its petition did not

---

**1.** We follow our past practice in juvenile and domestic relations cases which involve sensitive facts and do not utilize the last names of the parties. *See, e.g., West Virginia Dept. of Human Services v. La Rea Ann C.L.,* 175 W.Va. 330, 332 S.E.2d 632 (1985); *State v. Ellsworth J.R.,* 175 W.Va. 64 n. 1, 331 S.E.2d 503 n. 1 (1985).

**2.** Mark J. did not object to the circuit court's termination of his parental rights on April 15, 1985. He made no appearance in this matter after May, 1984. His only concern as articulated through his court-appointed counsel was to thwart any effort by Cheryl to regain custody of Amanda.

**3.** We note that W.Va.Code, 49–6–3(a) (1977), requires that a petition for emergency child

custody be filed before the DHS can obtain physical custody, and, in pertinent part, provides:

"Upon the filing of a petition, the court may order that the child be delivered for not more than ten days into the custody of the state department or a responsible relative, pending a preliminary hearing, if it finds that: (1) There exists imminent danger to the physical well-being of the child, and (2) there are no reasonably available alternatives to removal of the child, including, but not limited to, the provision of medical, psychiatric, psychological or homemaking services in the child's present custody. The initial order directing such custody shall contain an order appointing counsel and scheduling the preliminary hearing, and upon its service shall require the

address the availability of alternatives other than the impossibility of transferring physical custody to the father who worked for a carnival. The circuit court made no finding about alternatives less restrictive than the removal of the child and placed physical custody with the DHS which, in turn, placed Amanda in a foster home.

On May 10, 1984, at the preliminary hearing, the DHS recommended that Amanda be returned, through the Interstate Compact on the Placement of Children,[4] to the State of Maine. This would permit the Maine Department of Human Services to supervise her reunification with her mother who had family living in Maine. Cheryl and court-appointed counsel for Amanda concurred with this recommendation. The circuit court deferred acting on this motion and requested that the DHS obtain a placement plan from the Maine Department of Human Services.[5] The circuit court continued temporary custody of Amanda with the DHS pending receipt of a plan for services from the State of Maine. Cheryl returned to Maine in anticipation of her child following.

Maine submitted a plan dated July 16, 1984, to the DHS, which was received on July 23, 1984. The DHS sent the plan to the circuit court on September 12, 1984, including it as an attachment in a request for termination of all parental rights. At an October 16, 1984 hearing, the DHS obtained permission to amend its petition to terminate Cheryl's parental rights. Cheryl, who had recently returned from Maine,[6] appeared at this hearing.

On November 7, 1984, the DHS filed its amended petition requesting the termination of Cheryl's parental rights. On November 15, 1984, Cheryl through her attorney filed a response to the amended petition in which she sought an improvement period. The court held a hearing on December 13, 1984, in which the facts surrounding the original abuse were developed and a finding of abuse and neglect was made, but no action was taken to terminate Cheryl's parental rights or on her request for an improvement period. Further hearings were held on April 15 and 18 and July 8, 1985, and at the July hearing, the parental rights were terminated.

■ This Court has long recognized the constitutional protections surrounding the right of a natural parent to the custody of his or her infant children, stating in Syllabus Point 1 of *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973):

"In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions."

*See also State v. T.C.*, 172 W.Va. 47, 303 S.E.2d 685 (1983); *State ex rel. Miller v. Locke*, 162 W.Va. 946, 253 S.E.2d 540 (1979).

We relied in *Willis* on *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1213,

---

immediate transfer of custody of such child to the state department or a responsible relative."
In 1984, the legislature amended W.Va.Code, 49–6–3, by adding a new subsection (c), which enables the DHS to obtain physical custody without a prior court order in certain extreme situations and sets a prompt post-seizure hearing. The 1984 amendments did not become effective until June 10, 1984.

**4.** W.Va.Code, 49–2A–1, *et seq.* (1975).

**5.** It does not appear that the Interstate Compact on the Placement of Children requires a placement plan from the receiving state in this situation. Under W.Va.Code, 49–2A–1, Article III(b), the sending state forwards its request and rea-

sons for intending to send the child to the receiving state, which then notifies the sending state in writing that they concur. The receiving state's only responsibility is to find "that the proposed placement does not appear to be contrary to the interests of the child." W.Va.Code, 49–2A–1, Article III(d). *See In re Matter of Pima County v. Fisher*, 125 Ariz. 430, 610 P.2d 64 (1980); *Sinhogar v. Parry*, 53 N.Y.2d 424, 425 N.E.2d 826, 442 N.Y.S.2d 438 (1981).

**6.** A report from the Maine DHS dated October 24, 1984, indicates that Cheryl after returning to Maine had been in contact with the Maine DHS regarding the return of her daughter on some thirteen occasions. When it appeared further hearings were required in West Virginia, she returned to this State in October, 1984.

31 L.Ed.2d 551, 559 (1972), where the United States Supreme Court stated:

"The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, *Meyer v. Nebraska,* [262 U.S. 390, 399, 43 S.Ct. 625, 626–27, 67 L.Ed. 1042 (1923)], the Equal Protection Clause of the Fourteenth Amendment, *Skinner v. Oklahoma,* [316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942)], and the Ninth Amendment, *Griswold v. Connecticut,* 381 U.S. 479, 496, 85 S.Ct. 1678, 1688, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring)."

*Stanley* retains its constitutional vitality as is evidenced by *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599, 606 (1982), where the Supreme Court, after concluding that parental rights cannot be terminated under the due process clause upon less than a "clear and convincing" evidence standard, declared:

"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evap-

orate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." [7]

Our statute, W.Va.Code, 49–6–2(c) (1984), also requires "clear and convincing" proof. *In Interest of S.C.,* 168 W.Va. 366, 284 S.E.2d 867 (1981).

W.Va.Code, 49–6–2(b) (1984),[8] permits a parent to move the court for an improvement period which shall be allowed unless the court finds compelling circumstances to justify a denial. We explained in *State v. Scritchfield,* 167 W.Va. 683, 692–93, 280 S.E.2d 315, 321 (1981):

"Clearly, the statute presumes the entitlement of a parent to an opportunity to ameliorate the conditions or circumstances upon which a child neglect or abuse proceeding is based pending final adjudication, no doubt in recognition of the fundamental right of a parent to the custody of minor children until the unfitness of the parent is proven. *See, e.g.,*

---

**7.** *Santosky,* 455 U.S. at 763–64, 102 S.Ct. at 1400, 71 L.Ed.2d at 613, also makes some penetrating observations in regard to the potential for overmatch in a parental termination case:

"The State's ability to assemble its case almost inevitably dwarfs the parents' ability to mount a defense. No predetermined limits restrict the sums an agency may spend in prosecuting a given termination proceeding. The State's attorney ... enjoys full access to all public records concerning the family. The State may call on experts in family relations, psychology, and medicine to bolster its case. Furthermore, the primary witnesses at the hearing will be the agency's own professional caseworkers whom the State has empowered both to investigate the family situation and to testify against the parents. Indeed, because the child is already in agency custody, the State even has the power to shape the historical events that form the basis for termination.[13]

"The disparity between the adversaries' litigation resources is matched by a striking asymmetry in their litigation options. Unlike criminal defendants, natural parents have no 'double jeopardy' defense against repeated state termination efforts."

Note 13 of *Santosky,* 455 U.S. at 763, 102 S.Ct. at 1400, 71 L.Ed.2d at 613, states, in relevant part:

"In this case, for example, the parents claim that the State sought court orders denying

them the right to visit their children, which would have prevented them from maintaining the contact required by Fam. Ct. Act § 614.-1(d).... The parents further claim that the State cited their rejection of social services they found offensive or superfluous as proof of the agency's 'diligent efforts' and their own 'failure to plan' for the children's future."

This same pattern can be seen in this case.

**8.** W.Va.Code, 49–6–2(b) (1984), provides:

"In any proceeding under this article, the parents or custodians may, prior to final hearing, move to be allowed an improvement period of three to twelve months in order to remedy the circumstances or alleged circumstances upon which the proceeding is based. The court shall allow one such improvement period unless it finds compelling circumstances to justify a denial thereof, but may require temporary custody in the state department or other agency during the improvement period. An order granting such improvement period shall require the department to prepare and submit to the court a family case plan in accordance with the provisions of section three [§ 49–6D–3], article six-D of this chapter."

This section was amended effective June 10, 1984, to add the last sentence.

*In re Willis,* 157 W.Va. 225, 207 S.E.2d 129 (1973). The statute permits the court to deny such a request only upon a finding of 'compelling circumstances.'" *See also In re Thaxton,* 172 W.Va. 429, 307 S.E.2d 465 (1983).

Once the DHS amended its petition seeking permanent custody of Amanda, Cheryl moved the court for an improvement period. The trial court did not rule on the motion until the final adjudicatory hearing in July, 1985, when the court in effect denied it by terminating her parental rights. The court reasoned that for all practical purposes an improvement period had existed since the first hearing.

This conclusion cannot be supported by the facts. We can only conclude that the DHS provided, at best, only minimal assistance and that, although Cheryl cooperated, the DHS never altered its position that her parental rights should be terminated. As we have earlier noted, this position was taken by the DHS in its September 12, 1984 report to the court,[9] before Cheryl had returned to this State. The initial basis for the recommendation for total parental severance was based on what appears to be a misreading by the DHS of the Maine report of July 16, 1984,[10] which was received by the DHS on July 23, 1984. This was clarified in Maine's letter of October 12, 1984.[11]

In October, 1984, Cheryl had contact with the DHS and followed its recommendation to utilize the local mental health agency. From November through December 13, 1984, the DHS paid for this counseling. At a hearing in April, 1985, Nikki Kesner, Cheryl's counselor at the mental health agency, testified that in December, 1984, the DHS indicated it would no longer pay for Cheryl's counseling. This was apparently because the counseling was in opposition to their position favoring removal of the child from Cheryl.

Ms. Kesner testified that as part of her counseling on parenting skills, she requested increased visitation between Cheryl and Amanda from only one hour once a week. She stated the DHS denied her request. According to Ms. Kesner, Cheryl continued working with the mental health agency after the DHS stopped paying for her sessions. She testified that Cheryl cooperated

---

9. From this report, it appears that one of the reasons the DHS moved for severance was that the foster parents had indicated a desire to adopt Amanda.

10. There was an earlier report of May 2, 1984, from the Maine DHS which the court had before it at the May 10, 1984, hearing where the parties recommended the interstate transfer of Amanda to Maine. This report revealed that Cheryl's other daughter had been removed from her custody and placed with her family in Maine several years before when it was determined that her boyfriend had sexually abused the child in Cheryl's absence. Despite these adverse facts, the court was willing to accede to the DHS's recommendation that Amanda be returned to the Maine DHS.

11. The text of the letter of October 12, 1984, reads:

"Thank you for the copy of the report(s) you sent to Mr. Bean in support of the hearing scheduled for October 16, 1984. For the record, we wish to clarify what may be misinformation that may be presented to the court. "1. In your 'Report to the Court' dated September 12, 1984, page # 1, item '2)' is incorrect. The Maine Department of Human Services has not offered any plan to Amanda's mother relative to rehabilitation/reunification efforts. It has been our information that the court wanted a plan proposed to it by Maine D.H.S. (item four of court order entered 5–15–84). Hence, we have not been authorized to offer any specific services to the family until approved by the court. "2. Relative to item '5)' of the report of 9–12: The Dept's prognosis for rehabilitation is 'guarded' (see letter of 7–16 from K. Edgecomb) and we believed that any replacement of the child (into a Maine foster home or with family) ought not occur until the family has been engaged in a (court approved) reunification effort for at least three (3) months. While your conclusion of 'no reasonable likelihood of rehabilitation' may ultimately be supported by evidence, we must reiterate that to date, no services have been offered to Amanda's mother subsequent to the order of this May. "3. In Dr. Life's letter to you of 7–10–84, he notes Amanda '... apparently had a long history of child abuse'. While not knowing the basis of that impression, our report of 5–2–84 to the court does not reveal any prior (before 4–28) abuses of Amanda but rather a risk of harm by virtue of her parent's conflictive relationship. "I trust that this information will be used to aid the court in making the best possible decision for Amanda."

and progressed in her skill level during these sessions. She also testified that she saw no imminent danger in reunifying Cheryl with her child.

A DHS social worker testified that Cheryl had been given material on budgeting and meal planning which she read, but did not extensively discuss. Cheryl was said to be cooperative, but reserved by the DHS personnel. They admitted that her attitude might be a result of its petition to sever her rights.

In October, 1984, after Cheryl had returned to this State, the DHS did assist her in finding a trailer to live in, but it lacked a cook stove. In January, 1985, the pipes in the trailer froze. Subsequently, Cheryl moved in with her boyfriend who was employed and whom she later married. The DHS worker commented that she had found the trailer to be clean and neat.

The DHS also encouraged Cheryl to find a job at a local chicken processing plant. She applied, but the plant had no permanent jobs available. She was placed on the on-call list which meant that if an employee was off, she might be called to fill-in. She was called twice in a ten-day interval. Cheryl then decided to maintain her steady work as a waitress and cashier at a local supper club. Because her child was in a foster home, she was not eligible for any regular benefits from the DHS.

■ Part of the problem in this case is the lack of a court-approved family case plan. As a result of a 1984 amendment to W.Va.Code, 49–6–2(b),[12] when an improvement period is authorized, then the court by order shall require the DHS to prepare a family case plan pursuant to W.Va.Code, 49–6D–3 (1984). Under W.Va.Code, 49–6D–3, the DHS is required to prepare a family case plan with participation by the parties and their counsel and to submit it to the court for approval within thirty days.[13] The purpose of the family case plan as set out in V.Va.Code, 49–6D–3(a), "is to clearly set forth an organized, realistic method of identifying family problems and the logical steps to be used in resolving or lessening these problems."[14]

This case aptly illustrates the legislative wisdom behind W.Va.Code, 49–6D–3. It is designed to foreclose a natural parent from being placed in an amphorous improvement period where there are no detailed stan-

---

**12.** For the complete text of W.Va.Code, 49–6–2(b) (1984), *see* note 8, *supra.*

**13.** W.Va.Code, 49–6D–3(b), in relevant part, states:

"[T]he family case plan described in subsection (a) of this section shall be furnished to the court within thirty days after the entry of the order referring the case to the department, and shall be available to counsel for the parent, guardian or custodian and counsel for the child or children. The department shall encourage participation in the development of the family case plan by the parent, guardian or custodian, and, if the child is above the age of twelve years and the child's participation is otherwise appropriate, by the child. It shall be the duty of counsel for the participants to participate in the development of the family case plan.... The court shall examine the proposed family case plan or any modification thereof, and upon a finding by the court that the plan or modified plan can be easily communicated, explained and discussed so as to make the participants accountable and able to understand the reasons for any success or failure under the plan, the court shall inform the participants of the probable action of the court if goals are met or not met."

**14.** W.Va.Code, 49–6D–3(a) (1984), also provides general goals for a family case plan:

"Every family case plan prepared by the department shall contain the following:
"(1) A listing of specific, measurable, realistic goals to be achieved;
"(2) An arrangement of goals into an order of priority;
"(3) A listing of the problems that will be addressed by each goal;
"(4) A specific description of how the assigned caseworker or caseworkers and the abusing parent, guardian or custodian will achieve each goal;
"(5) A description of the departmental and community resources to be used in implementing the proposed actions and services;
"(6) A list of the services which will be provided;
"(7) Time targets for the achievement of goals or portions of goals;
"(8) An assignment of tasks to the abusing or neglecting parent, guardian or custodian, to the caseworker or caseworkers, and to other participants in the planning process; and
"(9) A designation of when and how often tasks will be performed."
W.Va.Code, 49–6D–3(b), has a thirty-day time period for the preparation of the plan along with further details for its implementation.

dards by which the improvement steps can be measured. It also provides a meaningful blueprint that the DHS can monitor and which will also give the court specific information to determine whether the terms of the improvement period were met. Without such a plan, a court is then confronted with general testimony as to whether the natural parent has shown the requisite "improvement."

The point that bears emphasizing is that under W.Va.Code, 49–6–2(b), the family case plan is triggered when a court orders an improvement period. Here, the court took no formal action to order an improvement period and, as a consequence, there was never any court-approved family case plan as required by W.Va.Code, 49–6D–3(b).

It must be remembered that W.Va.Code, 49–6D–3, is a part of a larger enactment known as the West Virginia Child Protective Services Act (CPSA), W.Va.Code, 49–6D–1, *et seq.* Its purpose and intent are set out in W.Va.Code, 49–6D–2, which emphasizes that "the intention of the legislature [is] to provide for the removal of a child from the custody of the child's parents *only* when the child's welfare cannot be otherwise adequately safeguarded." (Emphasis added).

The DHS is given primary responsibility for the implementation of this act which became effective on June 10, 1984.[15] It may well be that because of its relatively recent enactment, the DHS and the lower court were not entirely familiar with its

terms. From a review of the record in this case, we find that the DHS fell far short of the goals envisioned by the CPSA and provided little relevant assistance to the mother in this case.

We cannot accept the DHS's position that good faith efforts were made toward a rehabilitative plan when its court position as early as September, 1984, was to have Cheryl's rights terminated. This was before any parenting assistance was extended to Cheryl by the DHS. The April 15 and 18, 1985, hearings clearly show that they were designed to determine whether to permanently sever Cheryl's parental rights as requested by the DHS. At the conclusion of these hearings, the court asked the DHS if it was satisfied and was assured that it was and the matter was then submitted for a decision.[16]

Curiously, following this hearing, the DHS prepared a revised family case plan for Cheryl, but appears not to have obtained any court approval under W.Va. Code, 49–6D–3(b).[17] Over the objection of Cheryl's counsel, a further hearing was held on July 8, 1985, at which point two DHS caseworkers testified about Cheryl's failure to meet the amended plan.

In the ordinary case where there are no compelling reasons to reject an improvement period under W.Va.Code, 49–6–2, we do not believe that the DHS should move for total severance of the parental rights in advance of a meaningful improvement period. Such an action appears contrary to the

---

**15.** Even before the enactment of the CPSA, it is clear from W.Va.Code, 49–6–1, *et seq.*, that the DHS had the primary responsibility for providing effective home counseling and psychiatric, medical, and other services to the parents of neglected and abused children.

**16.** This dialogue is reflected at pages 241 through 242 of the April 18, 1985 hearing:

"BY THE COURT: I understand that, but this has been, during the last several months, a time when you've been trying to rehabilitate or reconstruct or construct a relationship and abilities that would enable her to care for the child or restructure her life and attitude so that she would be suitable for, care for the child. Are you satisfied that she's now reached the maximum that she's going to? In

other words, you don't need any more any additional time?

"A. I don't know for what purpose.

"Q. It would serve no useful purpose that you can see, then? All right. Well, with that understanding, we'll, we're ready, I think, for a final conclusion in the matter. The Court is not prepared today to give you that decision. I do want to review the file in the matter and will get in touch with the attorneys, then, later on."

**17.** W.Va.Code, 49–6D–3(b) (1984), in relevant part, states: "The family case plan may be modified from time to time by the department to allow for flexibility in goal development, and in each such case the modifications shall be submitted to the court in writing."

provisions of the CPSA, which stresses the need to preserve the family relationship.

■ We, therefore, conclude that the court erred in permanently terminating the mother's rights to Amanda for several reasons. First, the mother was entitled to a meaningful improvement period to demonstrate her ability to care for her child as required by W.Va.Code, 49–6–2. There were no "compelling circumstances to justify a denial." W.Va.Code, 49–6–2(b). Second, the DHS did not comply with the provisions of W.Va.Code, 49–6D–3, in regard to preparing an appropriate family case plan for submission to the court and, of equal importance, the rendering of good faith efforts to provide assistance and counseling for the mother under it. Finally, the evidence did not reach the clear and convincing standard as required by procedural due process and as embodied in W.Va.Code, 49–6–2(c) (1984), to terminate Cheryl's parental rights.

We recognize that the child has been with the foster parents for almost three years and are aware that there are undoubtedly bonds of attachment between the child and the foster parents. However, constitutional considerations as reinforced by the CPSA mandate preservation of parental rights. It is only when bona fide attempts at counseling fail or the original abuse and neglect is so egregious that an improvement period will be of no avail that a court may be warranted in severing parental rights. Neither of these conditions is met in this case.

■ Because the mother did not voluntarily consent to give up her rights to her child, the application of the rule regarding the best interests of the child is not controlling. The Supreme Court of Connecticut in *In re Juvenile Appeal*, 177 Conn. 648, 671–72, 420 A.2d 875, 886–87 (1979), aptly described the reason why the best interests rule is not applicable in a case involving the involuntary severance of parental rights:

"In contrast to custody proceedings, in which the best interests of the child are always the paramount consideration and in fact usually dictate the outcome, in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings begun. No all-encompassing 'best interests' standard vitiates the requirement of compliance with the statutory criteria. See *Alsager v. District Court of Polk County, Iowa*, [406 F.Supp. 10 (S.D.Iowa 1975), *aff'd*, 545 F.2d 1137 (8th Cir.1976)]; *In re Adoption of Children by D.*, 61 N.J. 89, 293 A.2d 171 (1972); *Malpass v. Morgan*, 213 Va. 393, 192 S.E.2d 794 (1972); Ketcham & Babcock, 'Statutory Standards for the Involuntary Termination of Parental Rights,' 29 Rutgers L.Rev. 530, 539 (1976); comment, 'Termination of Parental Rights in Adoption Cases: Focusing on the Child,' 14 J.Fam.L. 547, 550 (1975).

"Insistence upon strict compliance with the statutory criteria before termination of parental rights and subsequent adoption proceedings can occur is not inconsistent with concern for the best interests of the child. Rather, it enhances the child's best interests by promoting autonomous families and by reducing the dangers of arbitrary and biased decisions amounting to state intrusion disguised under the rubric of the child's 'best interests.' See Wald, 'State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights,' 28 Stan.L.Rev. 623, 638–39 (1976)."

The Connecticut Supreme Court went on to explain a recurrent social problem that courts and commentators have observed with regard to terminating natural parents' rights to their children when the parents are economically deprived—the existence of a bias in favor of having the child with someone who is more economically secure:

"Petitions for termination of parental rights are particularly vulnerable to the risk that judges or social workers will be tempted, consciously or unconsciously, to compare unfavorably the material advantages of the child's natural parents with those of prospective adoptive parents and therefore to reach a result based on such

comparisons rather than on the statutory criteria. The United States Supreme Court has forcefully recognized this danger: 'Commentators have ... noted ... that middle- and upper-income families who need temporary care services for their children have the resource to purchase private care.... The poor have little choice but to submit to state-supervised child care when family crises strike.... Studies also suggest that social workers of middle-class backgrounds, perhaps unconsciously, incline to favor continued placement in foster care with a generally higher-status family rather than return the child to his natural family, thus reflecting a bias that treats the natural parents' poverty and lifestyle as prejudicial to the best interests of the child. [Citations omitted.] This accounts it has been said, for the hostility of agencies to the efforts of natural parents to obtain the return of their children.' *Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 834–35, 97 S.Ct. 2094, 2104–2105, 53 L.Ed.2d 14 [28–29] (1977)." 177 Conn. at 672–73, 420 A.2d at 886–87. *See also In Interest of B.M.*, 335 N.W.2d 321 (N.D.1983); *In re Kristina L.*, 520 A.2d 574 (R.I.1987).

Here, as we pointed out earlier, the policy of the legislature is to favor rehabilitating the family unit before severing parental rights. Thus, the rule regarding the best interests of the child is not controlling in this proceeding.[18]

For the foregoing reasons, the judgment of the Circuit Court of Hardy County is reversed and this case is remanded for further proceedings not inconsistent with this opinion. These proceedings will consist of approving an appropriate family case plan under W.Va.Code, 49–6D–3(a), and ultimately determining whether or not to reunite Cheryl with her daughter.

Reversed and Remanded.

NEELY, Justice dissenting:

I dissent because the record in this case conclusively demonstrates that the appellant is incapable of improvement and the child's welfare will be jeopardized by a return of custody to the natural mother.

The record before us discloses a plethora of pertinent facts not discussed in the majority's opinion. Cheryl has an older daughter by a previous liaison, Danielle, who currently lives with her maternal grandparents in Maine. Cheryl was forced to relinquish her custodial rights to Danielle when the Maine Department of Human Services intervened after discovering that Cheryl had left Danielle with a male babysitter who had given Danielle gonorrhea. On 22 April 1984, Cheryl was observed in Wardensville, West Virginia pushing Amanda in her carriage up and down the streets of Wardensville in the rain. This apparently continued for approximately a half an hour, while Amanda was scantily clad and wrapped in a soaking wet blanket. That evening, Cheryl and Mark, Amanda's biological father, entered a local bar and grill and sat down to eat dinner. Amanda, meanwhile, was left outside the bar and grill, unattended. Mark and Cheryl retrieved Amanda only upon the protests of fellow patrons.

After leaving Wardensville at the request of Mark, Cheryl and Amanda spent approximately a week in Maryland. When Mark did not come to Maryland with provisions he had promised, Cheryl returned with Amanda to Wardensville. When Cheryl located Mark, she proceeded to assault him verbally and physically. Cheryl was so intent on avenging herself against Mark that, within the space of one hour, she dropped Amanda three times. Moreover, witnesses testified that Cheryl continued to assault Mark even after Amanda had made it clear through her screams of pain that she required attention.

**18.** We distinguish cases where the natural parent has voluntarily consented to the adoption and afterwards seeks to regain the child from foster parents seeking to adopt or from adoptive parents. In this situation, where the child has been away from the natural parent for a consid-

erable period of time, we have indicated that a court could consider among other factors the best interests of the child. *E.g., Lemley v. Barr*, 176 W.Va. 378, 343 S.E.2d 101 (1986); *West Virginia Dept. of Human Services v. La Rea Ann C.L., supra.*

Mark's parental rights have been terminated, and he pays no child support. Cheryl does not currently have a job, has evidenced an inability to hold a job in the past, and has been resistant to attempts to help her find steady employment consistent with the responsibilities of a single parent. Moreover, Cheryl appears to be unable to maintain her own residence. She now lives with her boyfriend in his mobile home.[1] Dr. Stein, with whom Cheryl has had several counseling sessions, testified that Cheryl "has a very pronounced pattern of putting her own needs for romantic relationships in a superior position to the needs of the child." Dr. Stein states that he has "very serious reservations that the interest of the child would be best served by returning custody to the biological mother."

Dr. Life, Amanda's pediatrician, testified that, when Amanda was first placed in foster care, she appeared malnourished. Dr. Life testified that Amanda's physical and emotional health have improved greatly since Amanda has been placed with foster parents, but that Amanda continues to suffer physiological setbacks and emotional problems following her weekly visits with Cheryl.

Testimony elicited at the hearings indicated that Cheryl was generally inattentive to Amanda's safety, clothing, nourishment, and sanitary needs. Cheryl has apparently been generally uncooperative with, and unpleasant toward, departmental caseworkers who have been attempting to help her improve her parenting skills. Moreover, Cheryl's personal life is and has been for some time in considerable disorder. She has children by two different men (Amanda out of wedlock), and has been deserted by and since divorced Amanda's father. Moreover, Cheryl reportedly attempted suicide in the summer of 1985.

In Syl. pt. 1 of *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980), we held:

As a general rule the least restrictive alternative regarding parental rights to custody of a child under *W.Va.Code*, 49–6–5 [1977] will be employed; however, courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened, and that is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and physical development retarded by numerous placements.

*See also In Interest of Darla B.*, 175 W.Va. 137, 331 S.E.2d 868 (1985). The majority correctly notes that, as a matter of technical doctrine, the doctrine of "the best interest of the child" is not applicable to this case. However, that academic observation does not imply that the interest of Amanda should be a matter of utter indifference to this Court. In determining whether "compelling circumstances" exist under *W.Va.Code*, 49–6–2(b) [1984], we must, as *R.J.M.* suggests, weigh the *probability* that a child will suffer irreparable physical or psychological harm against the speculative *possibility* that a natural parent with an established record of chronic neglect and abuse may some day bring his or her behavior within the acceptable tolerances of parenting conduct. After all, "it must be remembered that we are not * * * [dealing with] a piece of property, but rather with a feeling, vulnerable, and sorely put upon little human being." *Lemley v. Barr*, 176 W.Va. 378, 343 S.E.2d 101 (1986).

The Department of Human Services, Dr. Stein, Dr. Life, the guardian ad litem for the child, and even Amanda's natural father believe that Amanda's interest would be ill-served by being returned to Cheryl. On the record before it, the trial court had ample evidence upon which it could find that there was "no reasonable likelihood that the conditions of neglect or abuse can

---

1. At oral argument it was represented that Cheryl and her boyfriend are now married. However, there has been no evidence presented about Cheryl's new husband's employment, income or character. The character of this man and the quality of the home he would provide for Amanda are certainly issues to which the trial court should devote close scrutiny in its further proceedings.

be substantially corrected in the near future." *W. Va. Code*, 49–6–5(a)(6) [1984]. Although no family case plan was prepared by the Department of Human Services, department workers had been working with Cheryl for close to one year before her parental rights were terminated. During that time Cheryl showed little promise of improvement. It makes little sense for this Court to reverse the determination of the trial court and order the Department to prepare a family case plan when Amanda appears to be happy and thriving with her foster parents (who want to adopt her), and Cheryl has already amply demonstrated a marked inability to mend her ways. I would therefore hold that this case presents "compelling circumstances to justify a denial" within the meaning of *W. Va. Code*, 49–6–2(b) [1984], and would affirm the trial court.

I am authorized to say that BROTHERTON, J., joins in this dissent.