624 S.E.2d 834

STATE of West Virginia ex rel. the WEST
VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
Petitioner,

v.

The Honorable Fred FOX, Judge of the
Circuit Court of Marion County; and
Miranda M. and Charles M., Respon-
dents.

No. 32847.

Supreme Court of Appeals of
West Virginia.

Submitted Oct. 5, 2005.

Decided Nov. 17, 2005.

Dissenting Opinion of Justice
Maynard Dec. 2, 2005.

Concurring Opinion of Justice
Starcher Dec. 15, 2005.

Concurring Opinion of Justice
Benjamin Dec. 20, 2005.

Rocco Fucillo, Fairmont, for Petitioner, West Virginia Department of Health and Human Resources.

Natalie J. Sal, Morgantown, for Respondent, Miranda M.

Frances C. Whiteman, Fairmont, Guardian Ad Litem for Infant Child.

Sean Murphy, Morgantown, for Respondent, Charles M.

PER CURIAM:

The West Virginia Department of Health and Human Resources (hereinafter "WVDHHR") seeks a writ of prohibition to prevent the enforcement of an order of the Circuit Court of Marion County dated August 8, 2005, returning physical and legal custody of the infant child, Sean M. (hereinafter "Sean"),[1] to his parents. The WVDHHR argues that the father, Charles M. (hereinafter "Charles"), was responsible for the death of Dominic M. (hereinafter "Dominic"), the sibling of Sean; therefore, Sean should not be returned to the custody of his parents, Charles and Miranda M. (hereinafter "Miranda"). Based upon the

parties' arguments, the record designated for our consideration, and the pertinent authorities, we deny the writ of prohibition.

I.

FACTUAL AND PROCEDURAL HISTORY

The matter before this Court deals only with abuse and neglect proceedings as they relate to Sean; however, it is necessary to discuss Dominic's case because of its significant impact on Sean's case. Sean was born on October 3, 1997, and his younger brother, Dominic, was born July 29, 2002. Dominic died on April 9, 2003, at the age of eight months, and the circumstances surrounding his death gave rise to the abuse and neglect proceedings as they related to both Sean and Dominic.

On April 6, 2003, Miranda put Dominic to bed in the late evening. She left for work soon thereafter, leaving both Sean and Dominic in the care of their father, Charles. The next morning at 5:30 a.m., Dominic seemed congested, and within thirty minutes, he was not breathing. Charles called for emergency assistance, and Dominic was transported to Fairmont General Hospital and subsequently transferred to West Virginia University Hospitals in Morgantown, West Virginia. Dominic was in full cardiac arrest, and was unstable hemodynamically, cardiovascularly, and hematologically. He also had bilateral retinal hemorrhages and a left parietal subdural hematoma that appeared acute in nature with global edema. In lay terms, Dominic had a large brain bleed caused from head trauma. Surgery was performed to drain the blood, but Dominic remained on life support and was pronounced to be brain dead. The decision was made to remove life support, and Dominic died on April 9, 2003.

The WVDHHR was contacted by the hospital regarding Dominic's injuries. Child abuse and neglect proceedings were instituted on April 8, 2003, on behalf of Dominic and Sean.[2] The petition was based on reports

1. "We follow our past practice in juvenile and domestic relations cases which involve sensitive facts and do not utilize the last names of the parties." *State ex rel. West Virginia Dep't of Human Servs. v. Cheryl M.*, 177 W.Va. 688, 689

n. 1, 356 S.E.2d 181, 182 n. 1 (1987) (citations omitted).

2. West Virginia law allows abuse and neglect proceedings to be instituted for children residing

from the treating doctors that opined that Dominic suffered from symptoms consistent with Shaken Baby Impact Syndrome (hereinafter "SBIS"), and that his injuries were consistent with a recent, non-accidental trauma. The petition sought immediate custody of both children.

■ On April 8, 2003, Sean was placed in the physical and legal custody of WVDHHR. Sean was placed in foster care, and was eventually located with his maternal grandparents in Maryland. It was alleged that the father, Charles, was responsible for the injury and subsequent death of Sean's younger brother, Dominic. In addition to the civil abuse and neglect proceedings to determine whether Sean should be removed from his parents' custody, criminal proceedings also were instituted against Charles.[3] On March 28, 2004, Charles was convicted by a jury of the crime of death of a child by a parent. However, the verdict was set aside on May 4, 2004, due to juror misconduct. Thereafter, instead of facing the expense of a second trial, Charles entered an Alford Plea[4] of guilty to the charge of involuntary manslaughter, and received two years of probation. In accepting the Alford Plea, the circuit court made the finding that "the record in this case supports the conclusion that there is a significant probability that a jury would convict this defendant of the charge contained in the indictment in this case. Whereupon, the Court accepted said Alford

Plea of guilty to Involuntary Manslaughter[.]"[5]

In the corollary abuse and neglect proceedings, a preliminary hearing was held on April 22, 2003. The circuit court made the following findings:

1. The infant's brother, Dominic ... suffered from symptoms consistent with Shaken Baby Impact Syndrome.

2. The parents have offered no explanation for how the symptoms occurred.

3. The infant, Sean ... should not be returned to the custody of his parents at this time.

Adjudicatory hearings were held on July 13, 2004, and October 26, 2004. The circuit court never made a finding as to whether the parents were guilty of abuse in the death of Dominic, and therefore, never made the predicate determination of whether Sean was an abused child. As the hearings progressed, more medical evidence was presented contradicting Dominic's diagnosis of SBIS. Thereafter, on April 18, 2005, the circuit court granted the parents a pre-adjudicatory improvement period.

The circuit court based its decision to grant a pre-adjudicatory improvement period, in part, on the reports submitted by the Guardian Ad Litem (hereinafter "GAL")[6] and the Court Appointed Special Advocate (hereinafter "CASA"). The GAL, as well as

---

in the same home as a child who has been physically abused. While there was no evidence that Sean personally experienced abuse, he qualified as an abused child because he lived in the same home as Dominic. For a discussion of the applicable law, see the Discussion section of this opinion, *infra*.

3. The mother, Miranda, was not charged with a crime. She was at work when Dominic stopped breathing, and she submitted to and passed a polygraph test. Because Charles was already charged with criminal abuse and neglect, his lawyer advised against submission to a polygraph test.

4. An Alford plea is a guilty plea by a defendant who continues to protest his or her innocence. *See State v. Lilly*, 194 W.Va. 595, 605 n. 2, 461 S.E.2d 101, 111 n. 2 (1995) (Cleckley, J., concurring).

5. We find it significant that the same circuit court judge presided over the criminal proceed-

ings and the civil abuse and neglect proceedings. The judge was cognizant of the testimony adduced during both proceedings, and had the benefit of complete and full knowledge of the expert testimony for both sides when he ruled in the abuse and neglect action. Notice is also due of the professional background of the particular circuit judge who presided over these matters. Judge Fox is an experienced trial court judge with more than twenty-five years of legal experience, who has also served as a member of this Court.

6. During the pendency of the civil abuse and neglect proceedings, a GAL was appointed to represent the best interests of the child, Sean. Not only did the GAL advocate to protect the best interests of Sean in the abuse and neglect proceeding, but she also attended the criminal trial of the father, Charles. Her knowledge and understanding of the medical evidence presented by both parties was instrumental in providing the court with the information needed to make a custody decision of this magnitude.

the CASA representative, held the opinion that Sean should be returned to the physical custody of his parents. This opinion was based on the fact that both parents had complied with all parameters of the pre-adjudicatory improvement period, and evidence that Sean would best be served by reunification with his parents. In addition to their compliance with the pre-adjudicatory improvement period and their cooperation with the authorities regarding the abuse and neglect investigation, the record further illustrated that Charles and Miranda had not been involved before with the WVDHHR. There were no allegations of any prior abuse or neglect, nor were there any allegations of drug or alcohol abuse. Both parents held steady employment and appeared to provide a loving and stable home for their children.

Moreover, in regard to the death of Dominic, evidence was introduced that his symptoms at death were more consistent with a subdural hematoma caused by a fall from bed[7] three weeks prior to his death, and were not consistent with shaken baby syndrome. Two experts testified regarding evidence of an old bleed in Dominic's head consistent with the timing of the fall, and they further testified that the death was caused by a slow bleed that worsened or that a re-bleed was triggered by slight movement on Dominic's part. Significantly, there was a lack of evidence to confirm shaken baby syndrome because the hallmark damage to the brain stem nerves was absent, as well as the absence of any neck tissue damage or rib bruising that is generally present in shaken baby syndrome. Based on this evidence, and based on the parents' compliance with the parameters set forth in the pre-adjudicatory improvement period, the circuit court[8] returned custody of Sean to his parents on July 19, 2005. The written order was entered August 8, 2005, and the WVDHHR filed a petition seeking a writ of prohibition to prevent the enforcement of this order. We issued a rule to show cause and now deny the petition.

7. The record shows that about three weeks prior to his death, Dominic rolled off of a bed onto carpet at his maternal grandparents' house when his mother became ill and left him briefly. The grandparents both acknowledged that this incident occurred. Sean was placed with these grandparents during the pendency of the abuse and neglect proceeding.

8. *See supra* note 5.

## II.

### STANDARD FOR ISSUANCE OF WRIT

■ We begin by outlining the standard of review in civil abuse and neglect proceedings, which has been established as follows:

" 'Although conclusions of law reached by a circuit court are subject to de novo review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.' Syl. Pt. 1, *In the Interest of Tiffany Marie S.,* 196 W.Va. 223, 470 S.E.2d 177 (1996)." Syl. Pt. 1, *State ex rel. Virginia M. v. Virgil Eugene S. II,* 197 W.Va. 456, 475 S.E.2d 548 (1996).

Syl. pt. 1, *State ex rel. Diva P. v. Kaufman,* 200 W.Va. 555, 490 S.E.2d 642 (1997).

■ Because this case was filed as a writ of prohibition seeking to prevent the enforcement of the circuit court's order, resolution of this case also necessitates our examination of the applicable standard for writs of prohibition. A writ of prohibition is an appropriate remedy "when the inferior court has not jurisdiction of the subject matter in controversy, or, having such jurisdiction, exceeds its legitimate powers." W. Va.Code § 53–1–1 (1923) (Repl.Vol.2000). It is undisputed that the circuit court has jurisdiction over

civil abuse and neglect proceedings; therefore,

"[i]n determining whether to grant a rule to show cause in prohibition when a court is not acting in excess of its jurisdiction, this Court will look to the adequacy of other available remedies such as appeal and to the over-all economy of effort and money among litigants, lawyers and courts; however, this Court will use prohibition in this discretionary way to correct only substantial, clear-cut, legal errors plainly in contravention of a clear statutory, constitutional, or common law mandate which may be resolved independently of any disputed facts and only in cases where there is a high probability that the trial will be completely reversed if the error is not corrected in advance." Syl. Pt. 1, *Hinkle v. Black*, 164 W.Va. 112, 262 S.E.2d 744 (1979).

Syl. pt. 2, *State ex rel. Diva P. v. Kaufman*, 200 W.Va. 555, 490 S.E.2d 642 (1997). *See also State ex rel. Chafin v. Halbritter*, 191 W.Va. 741, 743–44, 448 S.E.2d 428, 430–31 (1994) ("[P]rohibition may be substituted for a writ of error or appeal when the latter alternatives would provide an inadequate remedy.") (internal citations omitted). Mindful of these applicable standards, we now consider the parties' arguments.

## III.

## DISCUSSION

The primary issue presented for resolution by this Court is whether it was proper for the circuit court to return physical and legal custody of Sean to his parents. On appeal, the WVDHHR argues that Charles was responsible for the death of Dominic; therefore, Sean is not safe in the custody of Charles. A second issue raised by the WVDHHR is that the circuit court erred by granting a pre-adjudicatory improvement period. Conversely, the GAL and Miranda and Charles argue that the medical evidence did not support a conclusion of shaken baby syndrome. They further argue that the medical evidence is consistent with a fall that occurred three weeks prior to Dominic's death.

■ Because of the ease in disposing of the second issue regarding the granting of a pre-adjudicatory improvement period, we will

address it first. The WVDHHR argues that the trial court erred in granting a pre-adjudicatory improvement period because such motion is proper only if made prior to the final adjudication. In this case, the circuit court entered an order granting a pre-adjudicatory improvement period on April 18, 2005. The order makes it clear that "[t]he adult respondents have previously moved this Court to grant them a pre-adjudicatory improvement period." The order also makes it clear that due to the complexity of the issues and the need for consideration of conflicting expert testimony, the adjudication process was long. On the date that the court granted the pre-adjudicatory improvement period, the parties were present for the third day of hearings, and were scheduled for a fourth day of hearings. Based on medical reports, and the reports from both the GAL and CASA, the circuit court found that a pre-adjudicatory improvement period was in the best interest of Sean. Rule 23(a) of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings provides: "At any time prior to the final adjudicatory hearing, including at the preliminary hearing or emergency custody proceedings, a respondent may move for a pre-adjudicatory improvement period in accordance with W. Va.Code §§ 49–6–2(b) and 49–6–12(a)." The record demonstrates that the parties had already requested a pre-adjudicatory improvement period. Therefore, because it was prior to the final adjudication, the circuit court was within its authority to grant a pre-adjudicatory improvement period.

■ We will now turn to the primary issue in this case regarding whether it was error to return Sean to his parents' custody. We have previously indicated that:

In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.

Syl. pt. 1, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973). Notwithstanding this

Court's recognition of the constitutional rights afforded a natural parent to the custody of his or her child, we have also recognized that such a right is not absolute when we stated "[t]hough constitutionally protected, the right of the natural parent to the custody of minor children is not absolute and it may be limited or terminated by the State, as *parens patriae*, if the parent is proved unfit to be entrusted with child care." Syl. pt. 5, *id.*

■ The WVDHHR sought custody of Sean pursuant to W. Va.Code § 49–1–3(e) (1999) (Repl.Vol.2004), which states:

"Imminent danger to the physical well-being of the child" means an emergency situation in which the welfare or the life of the child is threatened. Such emergency situation exists when there is ... reasonable cause to believe that the following conditions threaten the health or life of any child in the home: (1) Nonaccidental trauma inflicted by a parent, guardian, custodian, sibling or a babysitter or other caretaker[.]

While there has been no specific finding that Sean was the personal victim of abuse, we have previously recognized that

" '[w]here there is clear and convincing evidence that a child has suffered physical and/or sexual abuse while in the custody of his or her parent(s), guardian, or custodian, another child residing in the home when the abuse took place who is not a direct victim of the physical and/or sexual abuse but is at risk of being abused is an abused child under W. Va.Code, 49–1–3(a) (1994).' Syl. Pt. 2, *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995)."

Syl. pt. 8, *State ex rel. Diva P. v. Kaufman*, 200 W.Va. 555, 490 S.E.2d 642 (1997). Therefore, if Dominic was abused, then Sean also qualifies as an abused child [9] because he resided in the same home where the alleged abuse occurred.

The circuit court concluded that there was no evidence that Sean had ever been the victim of abuse and returned him to his parents' custody on July 19, 2005. In determining whether the circuit court's conclusion was clearly wrong, we are guided by the proposition that

" ' "W. Va.Code, 49–6–2(c) [1980], requires the State Department of Welfare [now the Department of Health and Human Resources], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition ... by clear and convincing proof.' .... Syllabus Point 1, *In Interest of S.C.*, 168 W.Va. 366, 284 S.E.2d 867 (1981)." Syllabus Point 1, *West Virginia Department of Human Services v. Peggy F.*, 184 W.Va. 60, 399 S.E.2d 460 (1990).' Syllabus Point 1, *In re Beth*, 192 W.Va. 656, 453 S.E.2d 639 (1994)."

Syl. pt. 3, in part, *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995).

■ In examining the record, we first note that there is no evidence to support a finding that Sean was ever personally a victim of direct child abuse. Therefore, we look to the evidence surrounding Dominic's death to see if Sean lived in the home with an abused child, and, therefore, also qualifies as an abused child. While medical evidence was submitted that Dominic suffered from SBIS, evidence was also submitted to the contrary. The treating doctors diagnosed Dominic with SBIS; however, we find it significant that the fall from bed was never mentioned as a possible cause of Dominic's problems. It appears that, upon presentation to the hospital, no other option besides SBIS was considered as a possible source of Dominic's problems.[10] As the abuse and neglect case progressed and the GAL became involved, medical evidence was introduced by experts who examined Dominic's medical records and autopsy slides.[11] These experts

9. W. Va.Code § 49–1–3(a) (1999) (Repl.Vol. 2004), in pertinent part, states that an " '[a]bused child' means a child whose health or welfare is harmed or threatened by: (1) A parent, guardian or custodian who knowingly or intentionally inflicts, attempts to inflict or knowingly allows another person to inflict, physical injury or mental or emotional injury, upon the child or another child in the home[.]' "

10. Even though Dominic was documented high on admission testing for having a clotting abnormality, the treating physicians did not perform any screenings for blood disorders. Also, despite evidence of old blood being present on the CT scan, an MRI was not performed.

11. Notably, these experts have refused remuneration for their time and services.

opined that Dominic actually suffered from a head injury that was about fifteen days old, and that his death was caused by a re-bleed [12] of the injured area. Importantly, the timing of this old injury correlates with Dominic's fall from bed onto carpet while visiting at his grandparents' house. The defense experts also explained that Dominic suffered from a coagulation disorder, and this defect would have contributed to the likelihood of a slight fall causing a subdural hematoma, and would further contribute to its likelihood to re-bleed with any trivial movement. In light of the medical evidence, it is impossible to definitively state that Dominic was the victim of SBIS. Substantial evidence suggests Dominic fell from bed and that a chronic subdural hematoma formed that re-bled and caused his death.

In view of the facts presented, the evidence did not establish by clear and convincing proof that Charles abused Dominic. Therefore, there is no basis to find that Sean was an abused child as there is no allegation that he was the direct victim of abuse, and there is an absence of evidence showing that he lived in the same residence as another abused child. Therefore, the circuit court did not clearly err when it returned physical and legal custody of Sean to his parents, Charles and Miranda.

## IV.

## CONCLUSION

For the foregoing reasons, we deny the writ of prohibition and affirm the trial court's decision in its August 8, 2005, order returning custody of Sean to his parents.

Writ of Prohibition Denied.

Justice MAYNARD dissents and files a dissenting opinion.

Justices STARCHER and BENJAMIN concur and file concurring opinions.

MAYNARD, Justice, dissenting:

(Filed Dec. 2, 2005)

By upholding the circuit court's decision to return Sean to his father Charles, I fear that this Court has placed Sean in grave danger.

I believe there is clear and convincing evidence that the father's conduct resulted in the death of eight-month-old Dominic. It is significant that Dominic was found to have symptoms consistent with "shaken baby syndrome" when he was taken to the hospital. Qualified doctors from a prominent hospital within our State found that Dominic's injuries were non-accidental. Furthermore, Child Protective Service workers, who are trained in child abuse investigation and detection, concluded that Dominic was the victim of physical abuse, and his father was the most likely suspect.

In addition to the physical evidence of abuse, the father's Alford Plea of guilt to involuntary Manslaughter also indicates that he injured Dominic. I agree with the West Virginia Department of Health and Human Resources that eight-year-old child Sean has no place in a home with a father who pled guilty to involuntary manslaughter in causing the death of his own son. Even though Charles did not technically admit guilt in the plea, the trial court found that "the record in this case supports the conclusion that there is a significant probability that a jury would convict this defendant of the charge contained in the indictment in this case." This indicates to me that the evidence is strong enough to convince a jury beyond a reasonable doubt that Charles is responsible for the death of his son. Moreover, it does not seem logical that a loving father would plead guilty and be forever labeled a child killer if he bore no responsibility for Dominic's death. The burden of the stigma that will now follow Charles for life significantly outweighs the burden of any trial that he would have faced.

Given this compelling evidence, I firmly believe that Sean should never be returned to his father. No child should have to suffer the brutal injuries endured by Dominic. Head trauma of this magnitude caused Dominic more pain than most adults will experience in their lifetime. Then, after an unsuccessful surgery, Dominic died after his life support was removed. In my estimation, returning Sean to his father offers too great a risk that Sean may suffer the same fate as

---

12. The medical experts also opined that the slightest movement of Dominic could have triggered the re-bleed, the subdural hematoma that caused his death.

his younger brother. Accordingly, I must dissent to the majority opinion.

STARCHER, J., concurring:

(Filed Dec. 15, 2005)

I join this Court's majority opinion and write separately to note my strong agreement with the ruling of the distinguished circuit judge, the Honorable Fred Fox, whose ruling the DHHR challenged in the instant case.

To review the facts: this father was first convicted of manslaughter, based on highly-disputed circumstantial evidence—in a trial in which juror misconduct was so severe that Judge Fox found it necessary to set aside the verdict. That does not happen every day.

Shortly before the second trial, the prosecution offered to let the father enter a plea without admitting guilt and be sentenced to probation only. This also is a rare, rare event.

Facing staggering expert witness costs, and just coming out of a trial where the jury was clearly swayed by emotional issues, the father faced a terrible choice. Do I go to trial again, and risk prison and the near-certainty of losing my only living child? Or do I enter a plea, knowing that I will have a fighting chance to regain my family?

I admire this father's choice. Unlike my dissenting colleague, I think that this father's love for his living child was shown in his decision to take the *Alford* plea.

I know Judge Fox, and he is one of the most strict judges on child welfare and criminal sentencing in this State. Judge Fox is also the most senior sitting judge in our State. It is simply wrong to suggest, as the dissent does, that Judge Fox would put an innocent child at risk.

Accordingly, I concur with the majority opinion.

BENJAMIN, J., concurring:

(Filed Dec. 20, 2005)

I commend my fellow justices for their effort and care in the thorough review of the record in this difficult case and their dedication to justice for this family. That there may be disagreement in the outcome of this case is, in my opinion, less a matter of legal dissension than it is an endeavor by each justice to provide for Sean M.'s best interests.

I concur with the majority opinion not only because it is legally sound, but also because I believe that the result reached below, and affirmed by this Court, was necessitated by the particular facts of this case. While I appreciate and agree with the dissent's concerns, I write separately to express my disagreement with the view set out in the dissenting opinion. The dissent reasons that the medical evidence proved that Dominic M. suffered from shaken baby syndrome, and that his father, Charles M., entered a guilty plea to the charge of involuntary manslaughter for Dominic's death. Based on these two factors, the dissent avers that it was error to reunite Sean M. with his family because he is in danger in the presence of his father. Based upon a complete review of the unique and specific facts of this case, especially the ultimate medical conclusions regarding the probable circumstances of Dominic's death, I must disagree.

First, the trial court looked closely at all of the medical record, not just preliminary medical records. This complete medical record is, I believe, of great importance to the determination of whether this family should be reunited or should remain separated. It is understandable why the dissent, as well as many of the initial care givers involved in this case, felt that Dominic died from shaken baby syndrome. When Dominic first presented for treatment, shaken baby syndrome was the only practical option considered as a possible diagnosis. However, as the case progressed and further medical evidence was produced which contradicted the previous diagnosis, it soon became apparent that everyone involved needed to take a very close look at the entirety of the medical facts. When Dominic arrived at the hospital, he suffered from a "large brain bleed" caused from head trauma. His parents, Charles and Miranda, were questioned and were unable to explain their son's injuries. Because of their lack of an explanation, it was assumed that the child had been physically abused and the West Virginia Department of Health and Human

Resources ("WVDHHR") was contacted. To be clear, I do not fault the hospital's decision to contact the agency, nor do I fault the WVDHHR's vigorous prosecution of the child abuse and neglect proceedings.

As the investigation continued and a guardian *ad litem* became involved on Sean's behalf, and the corollary criminal trial of Charles ensued, more evidence was developed and a different explanation for Dominic's injuries began to emerge. It became apparent that Dominic did not suffer from shaken baby syndrome. Not only were the normal signs of shaken baby syndrome absent, but it also became apparent that Dominic suffered from a subdural hematoma and that there was evidence of an "old bleed" in his brain. Much of this evidence was learned after the autopsy, which is significant because it is critical evidence that the initial treating doctors did not have available to them before making a diagnosis of shaken baby syndrome. The experts' testimony regarding the timing of this bleed correlated with the timing of a fall off of a bed at the home of Dominic's grandparents three weeks prior to his death. There was also evidence presented regarding the possibility of Dominic having a clotting disorder. Again, this information was learned post-autopsy and was not available to the treating physicians prior to their provisional diagnosis.

Once all of the evidence was gathered and the experts convened, a very different picture appeared from what was initially thought at the outset of the case. The trial judge initially found that "Dominic ... suffered from symptoms consistent with Shaken Baby Impact Syndrome," and found that "[t]he infant, Sean ... should not be returned to the custody of his parents[.]" However, after hearing all of the evidence and hearing the experts' explanation, this same trial judge changed his mind and found that there was no evidence that Sean had ever been the victim of abuse. Sean was ordered returned to the custody of his parents. I am also impressed by the fact that the experts on the behalf of the father felt so strongly about the plight of the father that they refused any payment for their time or travel associated with their review of this case. Also, the Court-Appointed Special Advocate, whose job it is to advocate on behalf of children, supported the position of the parents in this case, and even drove to Charleston, West Virginia, to be present in person to show that support when this case was argued before us. In summary, the overall picture revealed a very different portrayal of Dominic's death than what was initially suggested.

I also cannot agree with the dissent's reliance on the father's entry of an *Alford* plea to bolster the belief that Sean should not be returned to the custody of his parents. At oral argument before this Court, counsel for the father made it very clear why Charles entered an *Alford* plea. The family was already deeply in debt from the first criminal trial that was set aside due to juror misconduct. Subsequent to this first trial, new evidence and new experts were found who explained the reality of what happened to Dominic. Counsel for Charles stated at oral argument that the family was facing at least another $100,000.00 in trial expenses to proceed with a second trial, on top of the debt accumulated from the first trial. We were also informed that other family members were putting themselves in debt to support Charles and Miranda in their legal battle. Tragically, Sean has already lost his brother. Then, he was separated from his parents. In the absence of evidence proving that Dominic suffered from shaken baby impact syndrome and the compelling evidence that shows he died of an accidental fall, I cannot fault the circuit court's decision to reunite Sean with his family.

In view of the foregoing, I concur.