490 S.E.2d 642

**STATE of West Virginia ex rel. DIVA P., and the State of West Virginia, Petitioners,**

**v.**

**Honorable Tod J. KAUFMAN, Judge of the Circuit Court of Kanawha County, and Sherry P., Respondents.**

No. 23928.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 25, 1997.

Decided July 11, 1997.

Concurring Opinion of Chief Justice Workman July 22, 1997.

William C. Forbes, Prosecuting Attorney, Brenda Waugh, Assistant Prosecuting Attorney, Charleston, for Petitioner State of West Virginia.

Julia B. Shalhoup, Campbell & Turkaly, Charleston, Mary Rich Maloy, Jackson & Kelly, Charleston, for Respondent Sherry P.

Darrell V. McGraw, Jr., Attorney General, Barbara L. Baxter, Assistant Attorney General, Joanna Bowles, Assistant Attorney General, Charleston, for Respondent Department of Health and Human Services.

## PETITION FOR A WRIT OF PROHIBITION

DAVIS, Justice:

This case is before the Court on a petition for a writ of prohibition, mandamus and writ of error[1] against the Honorable Tod J. Kaufman, Judge of the Circuit Court of Kanawha County, by the petitioners, Diva P. (hereinafter the "child" or "Diva")[2] and the State of West Virginia. Sherry P., mother of the child, is also named as a respondent.[3] Both the State and the child's guardian ad litem[4] seek relief from the November 19, 1996, disposition order which returned Diva to her mother for a three month improvement period. Petitioners contend that an additional improvement period is not in the best interest of Diva. Petitioners seek termination of Sherry P.'s parental rights.

## I.

## FACTUAL BACKGROUND

Marilyn T. McClure, McQueen, Harmon, Potter & Cleek, Charleston, for Petitioner Diva P.

At the age of 16, Sherry P. gave birth to Diva on May 11, 1993. At the time of the child's birth Sherry P. lived with her mother

---

1. This case is being viewed exclusively as a petition for writ of prohibition.

2. We follow our past practice in domestic cases that involve sensitive facts, and do not use the last names of the parties. *See State ex rel. West Virginia Dep't of Human Servs. v. Cheryl M.*, 177 W.Va. 688, 689 n. 1, 356 S.E.2d 181, 182 n. 1 (1987).

3. Sherry P. is represented by counsel in this matter and has filed a response brief. Judge Kaufman submitted a letter to this Court requesting his ruling be upheld.

4. This Court has previously indicated that a guardian ad litem "must exercise reasonable diligence in carrying out the responsibility of protecting the rights of the children[,]" including "exercising the appellate rights of the children, if, in the reasonable judgment of the guardian *ad litem*, an appeal is necessary." Syl. Pt. 3, in part, *In re Scottie D.*, 185 W.Va. 191, 406 S.E.2d 214 (1991) (emphasis in original).

and two sisters Brandy and Shelly.[5] Sherry P.'s sister Shelly is autistic and has extremely limited functioning capabilities. On July 17, 1993, Sherry P. and her mother left home to go to a local store. Diva was left in the care of Brandy. Without Brandy's knowledge, Shelly removed baby Diva from her crib. When Brandy attempted to take baby Diva from Shelly, Shelly threw the baby against the wall.

Upon learning that the child was thrown against a wall by Shelly, Sherry P. and her mother immediately took the child to Women's and Children's Hospital. The child was diagnosed as having a closed head injury. No further diagnosis was made at that time. The record indicates that Sherry P. questioned hospital personnel about what appeared to be a soft area on the left side of the child's head. Sherry P.'s concern about the soft area was dismissed as insignificant. Sherry P. was permitted to take the child home within hours of bringing her to the hospital.

On July 18, 1993, Sherry P. again took Diva to the hospital because of a lethargic look on her face. While at the hospital the second time, it was discovered that the child had a fractured right arm, hairline right skull fracture, as well as a depressed skull fracture.[6]

The West Virginia Department of Health and Human Resources (hereinafter "DHHR") was contacted regarding the child's injuries. DHHR filed a neglect and abuse petition against Sherry P. on July 23, 1993. Diva was taken into the custody of DHHR. After successfully completing an improvement period, the circuit court entered an agreed order on May 27, 1994, dismissing the petition. Diva was returned to Sherry P.[7]

On October 16, 1994, Sherry P. gave birth to a second child, Destiny P. (hereinafter "Destiny"). Destiny was born prematurely. Sherry P.'s physician recommended a heart monitor be used for the infant because of a high risk of sudden infant death syndrome. The heart monitor was designed to sound an alarm if Destiny's heart stopped beating. Sherry P. utilized the heart monitor for two months. During that two month period the evidence showed that the heart monitor was only disconnected a few days.[8] Unknown to Sherry P. the heart monitor was actually defective. Medical expert, Dr. Joseph Werthammer testified that a review of the recorded printout from the heart monitor revealed that it recorded a total of 6,000 alarms during the two month period that Sherry P. had the infant connected to the monitor.[9]

There was further evidence that both the hospital and the supplier of the heart monitor were aware after the first month of use by Sherry P., that the monitor was defective. Neither took steps to inform Sherry P. of this fact.[10] On December 29, 1994, Sherry P.

---

5. It is not clear from the record but Brandy is a few years older than Sherry P. Shelly is a few years younger than Sherry P.

6. At a hearing in the case, medical evidence was introduced that the hairline right skull fracture was evident during the initial visit to the hospital on July 17. However, medical personnel did not diagnose the condition. There was also evidence that the hospital did not x-ray the child's arm during the first visit.

The brief of respondent points out that medical records introduced into evidence revealed that critical entries were tampered with in this case. Erasures and re-entries were made that were not initialed. One incident identified in the brief refers to an ancillary note entry on July 19, 1993 which originally read: "On review of radiographics with radiologist today and with help of CT bone windows done [July] 18 it was evident that a small partial fracture was present at initial visit [July] 17." It was pointed out that material portions of the ancillary note had been erased and replaced with the following entry: "... it is possible that a questionable right partial fracture was present at initial visit [July] 17."

7. The order read in pertinent part:

"Based upon the fact [that] the situation which lead to the filing of the initial petition is no longer present, *the parties moved that this action be dismissed.*" (Emphasis added).

8. Numerically speaking, the testimony indicated that Sherry P. utilized the heart monitor approximately 84% of the time.

9. Dr. Werthammer testified that Destiny was having an alarm about every 12 minutes, day and night.

10. Sherry P. took the infant for a routine check up after the first month of having her home. During that hospital visit the heart monitor's data base was retrieved by hospital personnel,

gave Destiny a bath. Sherry P. laid down on a sofa holding the infant in her arms. A short time afterwards Sherry P.'s mother picked the infant up while Sherry P. slept and found that Destiny was dead. An autopsy was performed on Destiny. The autopsy determined that Destiny died of natural causes.[11]

Immediately after the death of Destiny an amended abuse and neglect petition was filed by DHHR against Sherry P. The petition alleged that Diva was abused and neglected. On October 4, 1996, Judge Kaufman held a final adjudication hearing on the matter. On October 30, 1996 the court issued an order, which was subsequently amended on November 15, 1996, finding the child to be neglected within the meaning of W.Va. 49–6–2 (1996).[12] A disposition hearing was held on October 21, 1996. Based upon testimony at the disposition hearing and the recommendation of DHHR, the court entered a disposition order on November 19, 1996. Diva was ordered returned to the custody of Sherry P. for a three month post-dispositional improvement period.[13] The State objected to the disposition order and urged the court to terminate the parental rights of Sherry P. Shortly after entry of the disposition order, Sherry P. was "indicted by the grand jury for the murder of her infant child, Destiny P." [14] Subsequent to the indictment, petitioners instituted this proceeding challenging the disposition order.

## II.

### STANDARD OF REVIEW

We begin by outlining the standard of review in civil abuse and neglect proceedings. The standard of review was established by this Court in syllabus point 1 of *State ex rel. Virginia M. v. Virgil Eugene S. II*, 197 W.Va. 456, 475 S.E.2d 548 (1996) as follows:

Although conclusions of law reached by a circuit court are subject to de novo review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly errone-

---

which data base informed the hospital that the heart monitor was defective as a result of the 4200 false alarms that were recorded. Additionally, the evidence indicates that Sherry P. contacted the supplier of the heart monitor on several occasions to inform the supplier that the machine was sounding an alarm constantly. However, nothing was done or said to her about the machine being defective.

**11.** In addressing the role of the heart monitor, Dr. Werthammer testified as follows:

THE COURT: Would you say the alarm was just worthless?

A. I would say it was less than worthless. It was a noise hazard.

THE COURT: Is there any conclusion you could reach about the mother's relationship to the monitor or the mother's relationship to the baby based on the monitor?

A. I would say this mother went the full hundred yards in keeping this baby on this monitor as long as she did with the compliance that's demonstrated by this thing.

You know, you sent me these things and then you sent me the report and told me a little bit about what this case was about.

I feel that there was negligence in this case—

MS. MCCLURE: Your honor, I'm going to object as to this isn't a civil action for negligence and I'm going to object if you're going to

place any blame on somebody else or some deviation from the standard of care.

That's irrelevant as to whether she neglected or abused her child.

A. That's the question I was asked —— Did this mother comply with what she was instructed to do. And my judgment is she went the full distance with it.

I think there was a problem, however, in making this an effective piece of equipment that might have prevented this child's death.

**12.** The brief of the petitioners bring up the point that the court *sua sponte* issued an amended order of neglect. This issue is irrelevant in light of the fact that the ultimate conclusion by both orders was the same. A review of the original order which was drafted by the State supports the assertion in the respondent's brief that the original order mischaracterized material facts in the case.

**13.** W.Va.Code § 49–6–5(c) (1996) provides that "[t]he court may as an alternative disposition allow to the parents or custodians an improvement period not to exceed six months."

**14.** The indictment indicates that Sherry P. was charged under the criminal child neglect statute. *See* W.Va.Code § 61–8D–4 (1996).

ous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety. Syl. Pt. 1, *In the Interest of Tiffany Marie S.,* 196 W.Va. 223, 470 S.E.2d 177 (1996).

The above standard of review requires deference by this Court to the findings of a circuit court in a civil abuse and neglect proceeding. The critical nature of unreviewable intangibles justify the deferential approach we accord findings by a circuit court. As we said in *Brown v. Gobble,* 196 W.Va. 559, 563, 474 S.E.2d 489, 493 (1996), "the standard of review for judging a sufficiency of evidence claim is not appellant friendly." *See Gentry v. Mangum,* 195 W.Va. 512, 520 n. 6, 466 S.E.2d 171, 179 n. 6 (1995) ("Only rarely and in extraordinary circumstances will we, from the vista of a cold appellate record, reverse a circuit court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect.").

 A writ of prohibition is an appropriate remedy in cases where the lower court has no jurisdiction over the subject matter in controversy, or, having such jurisdiction, exceeds its legitimate powers. W.Va.Code § 53–1–1 (1994). In the instant matter the circuit court has jurisdiction, therefore we look to syllabus point 1 of *Hinkle v. Black,* 164 W.Va. 112, 262 S.E.2d 744 (1979):

> In determining whether to grant a rule to show cause in prohibition when a court is not acting in excess of its jurisdiction, this Court will look to the adequacy of other available remedies such as appeal and to the over-all economy of effort and

money among litigants, lawyers and courts; however, this Court will use prohibition in this discretionary way to correct only substantial, clear-cut, legal errors plainly in contravention of a clear statutory, constitutional, or common law mandate which may be resolved independently of any disputed facts and only in cases where there is a high probability that the trial will be completely reversed if the error is not corrected in advance.

Thus "prohibition may be substituted for a writ of error or appeal when the latter alternatives would provide an inadequate remedy." *State ex rel. Chafin v. Halbritter,* 191 W.Va. 741, 743–44, 448 S.E.2d 428, 430–31 (1994) (citations omitted).

## III.

## DISCUSSION

We are confronted with three issues in this case: (1) the State as a party in this proceeding, (2) the sufficiency of evidence, and (3) the disposition case plan. We will review each in its turn.

### A.

### The State Is Not A Proper Party In This Proceeding

 During the litigation before the circuit court, all parties were represented by counsel. At the circuit court level, DHHR was represented by the Kanawha County Prosecutor (hereinafter "prosecutor"). DHHR did not request the prosecutor initiate proceedings in this Court. DHHR is not represented by the prosecutor before this Court.[15] The record indicates that DHHR agreed with the disposition order of the circuit court and DHHR recommended the disposition adopted by the court. The prosecutor disagreed with its client below, DHHR, and proceeded with the State[16] as its client

---

15. Subsequent to oral arguments DHHR submitted a brief in this case through its in-house counsel, the Office of the Attorney General. The only issue addressed by DHHR is its position that the prosecutor did not have authority to initiate the instant proceeding before this Court.

16. Under normal circumstances it would be correct to refer to DHHR as the State. However, in this proceeding the prosecutor has manufactured a distinction by naming the State as it would in any criminal prosecution. Therefore, the designation of State in this proceeding does not encompass DHHR.

in this proceeding.[17] The question for this Court is whether the State is a proper party to this matter.[18]

■ It is set out in W.Va.Code § 49–6–10 (1996),[19] in relevant part, that:

It *shall be the duty of every prosecuting attorney to fully and promptly cooperate* with persons seeking to apply for relief under the provisions of this article in all cases of suspected child abuse and neglect, to promptly prepare applications and petitions for relief requested by such persons[.][20] (Emphasis added).

DHHR sought relief against Sherry P. pursuant to the civil abuse and neglect statutes. The clear language of W.Va.Code § 49–6–10 made it mandatory for the prosecutor to *fully and promptly cooperate* with DHHR.[21] *See* Syl. Pt. 7, *Hodge v. Ginsberg*, 172 W.Va. 17, 303 S.E.2d 245 (1983) (" 'It is well established that the word 'shall,' in the absence of language in the statute showing a contrary intent on the part of the Legislature, should be afforded a mandatory connotation.' Syllabus Point 1, *Nelson v. Public Employees Insurance Board*, [171] W.Va. [445], 300 S.E.2d 86 (1982).").

■ In this proceeding the prosecutor attempts to justify his actions in this matter, without its client or its client's expressed approval, on several grounds. First, it is argued that W.Va.Code § 49–6–10 is unclear as to the role of the prosecutor in civil abuse and neglect proceedings. We discern no such ambiguity in the statute. " ' "When a statute is clear and unambiguous and legislative intent is plain the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute." Syl. pt. 1, *Cummins v. State Workmen's Compensation Comm'r*, 152 W.Va. 781, 166 S.E.2d 562 (1969).' Syl. pt. 3, *Kosegi v. Pugliese*, 185 W.Va. 384, 407 S.E.2d 388 (1991)." Syl. Pt. 3, *City of Kenova v. Bell Atlantic–West Virginia, Inc.*, 196 W.Va. 426, 473 S.E.2d 141 (1996). The statute provides that the prosecutor must cooperate with DHHR's efforts to pursue a civil action against Sherry P. pursuant to the civil abuse and neglect statutes. The record reveals that the prosecutor and the DHHR have disagreed regarding the civil action against Sherry P. The brief of the prosecutor states that: "The West Virginia Department of Health and Human Resources and the office of the Prosecuting Attorney have, throughout this case, disagreed as to the resolution of this case."

17. We believe it is necessary to commend the prosecutor's efforts for vigorously advocating for the rights of the child in this proceeding. However, as we have established in the body of this opinion, there are laws and principles which govern the relationship between the prosecutor and the DHHR.

18. In a recent decision, *In re Jonathan G.*, 198 W.Va. 716, 482 S.E.2d 893 (1996), we indicated that county prosecutors are required to act as attorneys for DHHR in civil abuse and neglect proceedings. The decision in *Jonathan G.* did not address the issue in a syllabus point. Consequently, the matter is again raised by the prosecutor. In the instant proceeding we make clear in the syllabus of this opinion what *Jonathan G.* declared regarding the relationship between county prosecutors and DHHR in civil abuse and neglect proceedings.

19. W.Va.Code § 49–6–10 is to be read in para materia with W.Va.Code § 49–6–1(a), which provides in relevant part:

(a) If [DHHR] or a reputable person believes that a child is neglected or abused, the department or the person may present a petition setting forth the facts to the circuit court[.]

20. The requirement regarding civil matters in general is set out in W.Va.Code § 7–4–1, in relevant part, as follows:

It shall also be the duty of the prosecuting attorney to attend to civil suits in such county in which the State, or any department, commission or board thereof, is interested[.]

This statute is not relevant or controlling because the legislature has enacted a specific statute setting out the role of prosecutors in civil abuse and neglect proceedings. "The rules of statutory construction require that a specific statute will control over a general statute[.]" *Daily Gazette Co., Inc. v. Caryl*, 181 W.Va. 42, 45, 380 S.E.2d 209, 212 (1989). *Citing* Syl. Pt. 1, *UMWA by Trumka v. Kingdon*, 174 W.Va. 330, 325 S.E.2d 120 (1984); *State ex rel. Simpkins v. Harvey*, 172 W.Va. 312, 305 S.E.2d 268 (1983).

21. Although the civil abuse and neglect statutes refer to DHHR and *reputable* persons, we are concerned here only with the authority granted DHHR. In the event anyone other than DHHR filed a petition, DHHR would ultimately be brought into the case in accordance with its statutory duty to so intervene.

■ In prosecutions under our *criminal* abuse and neglect statutes, the State is the client of the prosecutor. W.Va.Code § 7–4–1 (1971) provides, in relevant part, that "[i]t shall be the duty of the prosecuting attorney to attend to the criminal business of the State in the county in which he is elected[.]" We indicated in *State ex rel. Skinner v. Dostert,* 166 W.Va. 743, 752–753, 278 S.E.2d 624, 631 (1981), that "[a]s criminal offenses are offenses against the State which must be prosecuted in the name of the State, the prosecutor, as the officer charged with prosecuting such offenses, has a duty to vindicate the victim's and the public's constitutional right of redress for a criminal invasion of rights." (Citations omitted). Because the State is the client in *criminal* abuse and neglect cases, prosecutors have almost absolute discretion in determining the course of such prosecutions. We noted in *Skinner,* 166 W.Va. at 752, 278 S.E.2d at 631, "that the prosecuting attorney is vested with discretion in the control of criminal causes, which is committed to him for the public good and for the vindication of the public interest." However, we provided caution in syllabus point 2 of *State ex rel. Preissler v. Dostert,* 163 W.Va. 719, 260 S.E.2d 279 (1979), when we held that "[t]he prosecuting attorney is a constitutional officer who exercises the sovereign power of the State at the will of the people and he is at all times answerable to them. W.Va. Const., art. 2, Sec. 2; art. 3, Sec. 2; art. 9, Sec. 1."

■ In civil abuse and neglect cases, the legislature has made DHHR the state's representative. In litigations that are conducted under State civil abuse and neglect statutes, DHHR is the client of county prosecutors. The legislature has specifically indicated through W.Va.Code § 49–6–10 that prosecutors must *cooperate* with DHHR's efforts to pursue civil abuse and neglect actions. The relationship between DHHR and county prosecutors under the statute is a pure attorney-client relationship. The legislature has not given authority to county prosecutors to litigate civil abuse and neglect actions independent of DHHR. Such authority is granted to prosecutors only under State criminal abuse and neglect statutes. Therefore, all of the legal and ethical principles that govern the attorney-client relationship in general, are applicable to the relationship that exists between DHHR and county prosecutors in civil abuse and neglect proceedings.

■ In the instant proceeding, DHHR recommended a disposition of this case which the prosecutor opposed. The circuit court adopted the disposition recommended by DHHR. The prosecutor has now, independently of its client, challenged the adopted recommendation of its client. As an initial matter, the prosecutor's decision to seek a writ of prohibition in this case compromised many of the provisions of the Rules of Professional Conduct relating to the attorney-client relationship. E.g. Rule 1.2(a),[22] Rule 1.6(a)[23] and Rule 1.7(b).[24]

Loyalty is one of the cornerstones of the attorney-client relationship. The *Comment* to R.P.C., Rule 1.7 admonishes that "[a]s a general proposition, loyalty to a client prohibits undertaking representation directly adverse to that client without that client's consent." Further, information that is exchanged between a client and attorney is clothed in the ancient common law attorney-client communication privilege. *See also Lawyer Disciplinary Bd. v. McGraw,* 194 W.Va. 788, 799–800, 461 S.E.2d 850, 861–862 (1995) ("[A] lawyer's ethical duty of confidentiality under Rule 1.6 of the Rules of Professional Conduct applies to all information relating to representation of a client, protecting

22. The relevant part of Rule 1.2(a) provides: "(a) A lawyer shall abide by a client's decisions concerning the objectives of representation.... A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter."

23. The relevant part of Rule 1.6(a) provides: "(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation[.]"

24. The relevant part of Rule 1.7(b) provides: "(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests[.]"

more than just 'confidences' or 'secrets' of a client. The ethical duty of confidentiality is not nullified by the fact that the information is part of a public record or by the fact that someone else is privy to it.)" The course of conduct engaged in by the prosecutor in this case makes loyalty and the attorney-client communication privilege meaningless.[25]

Additionally, the prosecutor has attempted to interject in the case, for the purpose of this petition, a new client. That is, the prosecutor in filing this appeal has named the State as its client. The prosecutor justifies introducing the State as its new client in this case by citing language in our decision in *In re Jeffrey R.L.*, 190 W.Va. 24, 32–33, 435 S.E.2d 162, 170–71 (1993), wherein we indicated "that the State, in its role of parens patriae, 'is the ultimate protector of the rights of minors[,]' and 'has a substantial interest in providing for their health, safety, and welfare,' and may properly step in and do so when necessary." *Quoting In re Betty J.W.*, 179 W.Va. 605, 608, 371 S.E.2d 326, 329 (1988). The language from *Jeffrey R.L.* does not aid the prosecutor.

 In *Jeffrey R.L.*, DHHR sought to terminate parental rights, but the lower court returned the child to the mother. The issue on appeal was whether the lower court committed error in not terminating the mother's parental rights. In addressing that issue we spoke about the State as the ultimate protector of children and DHHR's role in carrying out the State's interest in civil abuse and neglect proceedings. We did not indicate that prosecutors were statutorily entrusted with independent enforcement of civil abuse and neglect proceedings. To the contrary, we made clear that the State had reposed that responsibility upon DHHR. In the instant proceeding, the prosecutor had no authority to invoke the State as its client. We further find that, absent statutory authority, when county prosecutors represent the DHHR, they may not invoke this Court's appellate or original jurisdiction in a civil

abuse and neglect proceeding, unless they have the express consent and approval of DHHR. We point out that this does not impair the right of a child's guardian ad litem to invoke the original or appellate jurisdiction of this Court, regardless of the position taken by DHHR. As a matter of fact, the guardian ad litem has an affirmative duty to take an assertive role in securing the child's rights, including prosecuting an appeal if the case so warrants. See *Scottie D.*, 185 W.Va. at 198, 406 S.E.2d at 221 ("[T]he 'guardian ad litem representing an infant plaintiff has full power to act for the purpose of securing the infant's rights, and may do all things that are necessary to this end.' 42 Am.Jur.2d Infants Sec. 178, at 165 (1969). Securing the infant's rights includes taking an assertive role and, if in the judgment of the guardian ad litem, a case so warrants, prosecuting an appeal.").

## B.

### Did The Evidence Support An Abuse Finding And Termination Of Parental Rights

The circuit court found the evidence insufficient to support terminating Sherry P.'s parental rights to the child. The guardian ad litem contends that the evidence in this case sustained a finding that Sherry P.'s parental rights should be terminated. The position taken by the guardian ad litem presents two issues: (1) did the evidence support an *abused child* adjudication and (2) was termination of parental rights the proper disposition.

 As an initial matter we note that in syllabus point 1 of *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973), this Court indicated that:

In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody or his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected

---

25. See W.Va.Code § 49–6A–7 (1977) wherein it is provided that:
 The privileged quality of communications between husband and wife and between any professional person and his patient or his client,

*except that between attorney and client,* is hereby abrogated in situations involving suspected or known child abuse or neglect. (Emphasis added).

and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.

There is tremendous responsibility imposed upon the judiciary when it is confronted with termination of parental rights. No greater connection to a child's existence can be found than that which links a child to its natural parents. In syllabus point 10 of *Matter of Brian D.*, 194 W.Va. 623, 461 S.E.2d 129 (1995) we said, in part, that " '[w]hen parental rights are terminated due to neglect or abuse, the circuit court may nevertheless in appropriate cases consider whether continued visitation or other contact with the abusing parent is in the best interest of the child.... ' Syl. Pt. 5, *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995)." In the single syllabus of *State ex rel. Kiger v. Hancock*, 153 W.Va. 404, 168 S.E.2d 798 (1969) we indicated, in part, that "[a] parent has the natural right to the custody of his or her infant child[.]"

▪ Notwithstanding the natural link between parent and child, this Court articulated in syllabus point 1 of *Willis* that, "[t]hough constitutionally protected, the right of the natural parent to the custody of minor children is not absolute and it may be limited or terminated by the State, as parens patriae, if the parent is proved unfit to be entrusted with child care." In syllabus point 3 of *Jeffrey R.L.* we held:

> Parental rights may be terminated where there is clear and convincing evidence that the infant child has suffered extensive physical abuse while in the custody of his or her parents, and there is no reasonable likelihood that the conditions of abuse can be substantially corrected because the perpetrator of the abuse has not been identified and the parents, even in the face of knowledge of the abuse, have taken no action to identify the abuser.

▪ **Did the evidence support an abused child adjudication?** The circuit court's amended order of November 15, 1996 concluded that the child was a *neglected child* within the meaning of W.Va.Code § 49–1–3(g)(1) (1994). The court deemed the evidence insufficient to find the child was an *abused child* within the meaning of W.Va. Code § 49–1–3(a) (1994). The guardian ad litem contends that the evidence supported a finding that the child was an abused child.

W.Va.Code § 49–1–3(a), in pertinent part, defines abused child to mean a child whose welfare or health is harmed or threatened by "[a] parent, guardian or custodian who knowingly or intentionally inflicts ... or knowingly allows another person to inflict, physical injury or mental or emotional injury, upon the child or another child in the home[.]" In syllabus point 1, in part, of *Brenda C.* we pointed out that " ' " 'W.Va.Code, 49–6–2(c) [1996], requires the State Department of Welfare [now the Department of Health and Human Resources], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition ... *by clear and convincing proof*[.]' ' Syllabus Point 1, *In Interest of S.C.*, 168 W.Va. 366, 284 S.E.2d 867 (1981)." Syllabus Point 1, *West Virginia Department of Human Services v. Peggy F.*, 184 W.Va. 60, 399 S.E.2d 460 (1990).' Syllabus Point 1, *In re Elizabeth Jo "Beth"*, 192 W.Va. 656, 453 S.E.2d 639 (1994). Syl. Pt. 3, *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995)." (Emphasis added).

▪ In determining whether the circuit court was clearly erroneous in finding that DHHR failed to meet its burden of proving by clear and convincing evidence that the child was an abused child, we must first place this case in its proper context. The initial petition filed against Sherry P. was dismissed, without prejudice, by an agreed order dated May 27, 1994.[26] The dismissal order stated that "the situation which lead to the filing of the initial petition is no longer present[.]" The order further indicated that Sherry P. "has fully complied with the services provided [by] the Department[.]" Therefore, the initial incident could only be considered in this proceeding as evidence of other allegations of child abuse and neglect. We pointed out in syllabus point 8 of *In Interest of Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991) that:

---

**26.** The dismissal occurred without adjudication and disposition hearings taking place.

Prior acts of violence, physical abuse, or emotional abuse toward other children are relevant in a termination of parental rights proceeding, are not violative of W.Va. R.Evid. 404(b), and a decision regarding the admissibility thereof shall be within the sound discretion of the trial court.

The amended petition filed after the December 29, 1994 death of baby Destiny did not revive the averments contained in the initial petition filed on behalf of Diva. The guardian ad litem contends that the evidence concerning the July 17, 1993, injuries to Diva and the December 29, 1994, death of baby Destiny, established by clear and convincing evidence that Diva was an abused child. As to the July 17 incident it is argued that Sherry P. failed to provide an adequate explanation for the injuries to the child.[27] We disagree.

First, there is no evidence in the record to show that Sherry P. personally injured Diva. Nor was there any evidence to establish that Sherry P. was actually present when the child was injured. The record indicates that the child was briefly left in the care of Brandy, while Sherry P. and her mother went to a store. There was no evidence to suggest that Brandy was not a responsible babysitter. Brandy testified that Shelly threw the child against a wall after she was discovered holding the child. The guardian ad litem alleges that its witness, Dr. M.L. McJunkin, testified that the injuries to the child could not have occurred as indicated by Brandy. Our review of Dr. McJunkin's testimony reveals the opposite. During cross-examination Dr. McJunkin clearly stated that the injuries could have come as a result of being thrown against a wall.

Shelly was not allowed to hold the child unless some adult was present. Shelly was not allowed to remove the child from the crib. The restrictions placed on Shelly evidenced sensitivity to the fact that she was autistic or emotionally unstable.[28] Further, the record establishes that Shelly had not injured the child prior to July 17. There was no evidence that Shelly inflicted injuries on the child after the July 17 incident.

The record further reveals that Sherry P. immediately took the child to the hospital upon learning of the incident. Sherry P. returned to the hospital the very next morning upon observing that the child appeared lethargic.

■ As to the December 19, 1994, death of Destiny, the guardian ad litem contends that this incident constituted child abuse against Diva.[29] In syllabus point 2 of *Christina L.* we held that:

> Where there is clear and convincing evidence that a child has suffered physical and/or sexual abuse while in the custody of his or her parent(s), guardian, or custodian, another child residing in the home when the abuse took place who is not a direct victim of the physical and/or sexual abuse but is at risk of being abused is an abused child under W.Va.Code, 49–1–3(a) (1994).

Under the authority of *Christina L.* clear and convincing proof that Sherry P. abused Destiny by bringing about her death supports a finding that the child, Diva, was an abused child.

The circumstances surrounding the death of Destiny troubles this Court. The most compelling and persuasive evidence regarding Destiny's death comes from the autopsy report and the testimony of Dr. Werthammer. The autopsy report reveals no foul play or wrong doing in bringing about the death. The autopsy report concluded the infant died of natural causes.

---

27. The guardian ad litem contends that separate injuries occurred to the child on July 17 and July 18. *The evidence to sustain this contention is weak at best.* The medical documents indicate that hospital authorities should have discovered on July 17, the injuries that were diagnosed on July 18.

28. The guardian ad litem contends that there was insufficient evidence that Shelly was autistic.

Brandy testified that Shelly was diagnosed as autistic at age three and that Shelly was placed in a special class in school for emotionally unstable children. No evidence was offered to refute this testimony.

29. The prosecutor was only able to get a grand jury to return an indictment against Sherry P. for criminal neglect child abuse.

Dr. Werthammer testified that the heart monitor provided to Sherry P. was not merely defective—he testified that it was "worthless." Dr. Werthammer opined that if the heart monitor had been working correctly the infant might be alive today.

The guardian ad litem points out that during the few days prior to the infant's death, Sherry P. had disconnected Destiny's heart monitor. The evidence indicates that the heart monitor sent out 6,000 false alarms during the two month period that Sherry P. had the machine. In spite of each and every false alarm, Sherry P. faithfully kept the machine connected to Destiny. Dr. Werthammer testified that it was unprecedented for anyone to endure the sound of the alarm for such an extended period of time.

There was further evidence that, while Sherry P. was not aware that the heart monitor was defective, the hospital and supplier of the machine knew or reasonably should have known of the defect. Sherry P. took the infant to the hospital a month after getting the machine. The hospital retrieved data from the machine which indicated that it sounded 4,200 false alarms during the first thirty day period. The hospital took no action to correct the problem. The hospital failed to inform Sherry P. that the machine was defective. The evidence also indicates that Sherry P. reported to the supplier of the machine that it was constantly sounding an alarm. Again, no action was taken to inform Sherry P. that the machine was defective. In view of the facts presented the evidence did not establish by clear and convincing proof that Sherry P. abused Diva.

■■■■■ **Was termination of parental rights the proper disposition?** The guardian ad litem contends that the circuit court abused its discretion in granting Sherry P. a post-disposition improvement period. The guardian ad litem argued that the evidence supported terminating Sherry P.'s rights to baby Diva. As previously noted, W.Va.Code

§ 49–6–5(c) permits a post-disposition improvement period. In syllabus point 4 of *Matter of Jonathan P.,* 182 W.Va. 302, 387 S.E.2d 537 (1989) we held that:

Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, W.Va.Code, 49–6–5 [1977] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under W.Va.Code, 49–6–5(b) [1977] that conditions of neglect or abuse can be substantially corrected. Syllabus Point 2, *In re R.J.M.,* 164 W.Va. 496, 266 S.E.2d 114 (1980).

*See* Syl. Pt. 2, *State ex rel. West Virginia Dep't of Human Servs. v. Cheryl M.,* 177 W.Va. 688, 356 S.E.2d 181 (1987) ("W.Va. Code, 49–6–2(b) (1984), permits a parent to move the court for an improvement period which shall be allowed unless the court finds compelling circumstances to justify a denial.").

■■■■■ In our review of the record we find that the circuit court was not clearly erroneous, in determining that the guardian ad litem failed to establish that there was no reasonable likelihood the conditions of neglect could be substantially corrected. The record clearly establishes that a strong bond has developed between Sherry P. and Diva. Sherry P. complied with all the demands placed upon her by DHHR. The record does not reflect one instance where DHHR has requested something from Sherry P. and she failed to follow through on the matter. Every effort has been made by Sherry P. to do what DHHR has deemed necessary to reasonably assure the safety and well-being of Diva.[30]

## C.

### Disposition Case–Plan

■■■■■ The guardian ad litem argues that the circuit court was obligated to provide a

---

**30.** The guardian ad litem contends that the circuit court's order returning the child to Sherry P. conflicts with the condition of bond set in the criminal proceeding against her. The record indicates that the circuit court in the case *sub judice* stayed return of the child pending the outcome of this proceeding. This matter is ad-

dressed by Rule 5 of the Rules of Procedure for Child Abuse and Neglect, wherein it is provided that "[u]nder no circumstances shall a civil protection proceeding be delayed pending the initiation, investigation, prosecution, or resolution of any other proceeding, including, but not limited to, criminal proceedings."

case-plan in view of the decision to grant Sherry P. a disposition improvement period. We noted in syllabus point 3 of *Tiffany Marie S.* that:

> Under W.Va.Code, 49–6–2(b) (1984), when an improvement period is authorized, then the court by order shall require the Department of Human Services to prepare a family case plan pursuant to W.Va.Code, 49–6D–3 (1984). Syl. pt. 3, *State ex rel. W.Va. Department of Human Services v. Cheryl M.*, 177 W.Va. 688, 356 S.E.2d 181 (1987).

The record indicates a case-plan was prepared by DHHR. The case plan was not submitted to the circuit court for approval. We have reviewed the case-plan and instruct the parties to submit the same to the circuit court for appropriate inclusion in this case.

## IV.

## CONCLUSION

In view of the foregoing, we find that the petitioners are not entitled to relief and, therefore, we deny the requested writ.

Writ denied.

WORKMAN, C.J., concurs and files a concurring opinion.

WORKMAN, Chief Justice, concurring:

Justice Davis has done a fine job of examining this very difficult case from both a legal and a human perspective——which is what should be done in every child abuse and neglect case. Baby Diva may definitely be in harm's way, not (it seems from the record before us) from any malevolent intent on the part of this mother, but because she appears to lack any real parenting skills and perhaps because she may have very limited intellect. Yet, there appears to be a strong emotional bond between mother and child, and the mother has attempted to sustain a relationship with this child during all of these proceedings. Thus, the lower court in his discretion decided to make one last effort at remedying the problems leading to these proceedings. During the course of this post-dispositional improvement period the department should monitor Diva very closely. At the final dispositional hearing, the court will have Diva's life——figuratively and perhaps literally——in its hands, just as we do now.

I write separately on the issue of the role of the prosecuting attorney in abuse and neglect cases. When I authored the *Jonathan G.* case last year, we were presented with a classic case of the Department of Health and Human Resources and the prosecuting attorney taking conflicting positions on a termination issue. *See In re Jonathan G.*, 198 W.Va. 716, 482 S.E.2d 893 (1996). In the instant case, it is the same. From a very pragmatic view, this issue was particularly hard for me because over the course of almost sixteen years on the bench, I have seen the department fail to protect children and fail to advocate vociferously for them on many occasions.[1] In addition, although guardians ad litem are appointed to represent children, most of them until relatively recently, did not do much aggressive advocacy either, frequently not even appearing on appeal on behalf of the children. In Justice McHugh's case, *In re Jeffrey R. L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993), however, we clearly set forth the responsibilities of guardians ad litem in abuse and neglect cases. That opinion, together with an intensive effort to develop continuing legal education in this area, has created steady improvement in the quality of representation of children.[2]

Furthermore, I believe strongly that the community at large (all of us in the corporate sense) have an interest and a responsibility in abuse and neglect proceedings which could

---

**1.** A September 1996 legislative audit of the Child Protective Services Division (CPS) for the 1995 fiscal year, involving a twelve-county survey, found that despite the requirement that it conduct a face-to-face interview with the child or children within 14 days of being notified of suspected abuse or neglect, CPS failed to conduct any such interview in 46% of the cases. In 29% of cases, CPS conducted the interview within 14 days, in 15% of the cases, CPS conducted the interview within 15 to 90 days, and in 10% of the cases, CPS took over 90 days to interview the alleged victims. Information from Office of Legislative Auditor, Performance Evaluation and Research Division, September 1996 Report.

**2.** The *Jonathan G.* case and the instant one, precluding prosecutors from an independent role in abuse and neglect, impel me to re-emphasize that, now more than ever, guardians ad litem more than ever must be strong advocates for the children they represent.

and probably should be represented by prosecuting attorneys. Thank goodness, we as a society have stopped looking at child abuse as a "family problem" and now recognize that it's everyone's business. But as I have said in other contexts, it is up to courts to interpret the law, not create it. As much as I would like to make the policy decision that prosecuting attorneys have the right and responsibility to represent the public interest in protecting abused and neglected children when their position conflicts with the department's, I do not believe the law as currently constituted [3] permits them that role. Thus, it is my recommendation that the Prosecuting Attorneys Association and child advocacy organizations explore the possibility of bringing this issue to the attention of the Legislature and seeking legislative change in this area.

There cannot be too much advocacy for children. The public has a legitimate interest in protecting abused and neglected children, and the prosecutors are very logical representatives to carry out that mission if the Legislature chooses to modify the law to accord them that responsibility.

**3.** *See Jonathan G.* and *Diva* for further reasoning of this conclusion.