504 S.E.2d 635

**In the Interest of MICAH ALYN R., A Child Under the Age of Eighteen Years.**

**No. 24878.**

Supreme Court of Appeals of West Virginia.

Submitted March 24, 1998.

Decided June 22, 1998.

Concurring Opinion of Justice Workman June 23, 1998.

Robert S. Kiss, Tanya Godfrey, Gorman, Sheatsley & Company, Guardian ad Litem for Micah Alyn R.

Pat Lamp, Beckley, for Appellant, Ada R.

Darrell V. McGraw, Jr., Attorney General, Barbara Baxter, Assistant Attorney General, Charleston, for Appellee, West Virginia Department of Health and Human Resources.

MAYNARD, Justice:

This action is before this Court upon an appeal from a final order of the Circuit Court of Raleigh County entered on October 16, 1997. Pursuant to that order, the circuit court terminated the parental rights of the

appellant, Ada R.,[1] to her son, Micah Alyn R. The parental termination was based on evidence that Ada R. had physically abused Micah and had on occasion, failed to properly administer his HIV medication. On appeal, Ada R. contends that the circuit court erred by finding that her son was abused and neglected and concluding that the best interests of the child required termination of her parental rights.

This Court has before it the petition for appeal, all matters of record, and the briefs and argument of counsel. Based upon a careful review of the record and for the reasons set forth below, we remand this case to the circuit court for action consistent with this opinion.

I.

This case originated on July 11, 1996, when Ada R. placed her son in foster care by filing a voluntary placement agreement. At that time, Ada R. had been diagnosed with AIDS, and Micah, who was two and a half years old, was HIV positive.[2] Ada R. sought foster care for Micah due to both her and her child's severe illnesses. Although Micah was placed in the care of the Department of Health and Human Resources (hereinafter "Department"), Ada R. visited her son regularly.

On September 26, 1996, the Department filed a petition for review of the voluntary placement in the Circuit Court of Raleigh County. A hearing was held on September 27, 1996, at which time appellant and the Department agreed to continue the placement and visitation. On March 25, 1997, the Department filed a supplemental petition seeking to have the parental rights of Micah's father, Hansel R., terminated.[3] The petition indicated that Ada R. wanted Micah to be adopted. However, subsequently, Ada

R. changed her mind and decided to pursue full custody.

Hansel R. never appeared for any hearings in this matter and his parental rights were terminated on July 19, 1997. That same day, the Department sought termination of Ada R.'s parental rights. Kim Peck, the social services case worker, testified that she believed Ada R. was unable to physically take care of Micah because of her mental and physical condition. She stated that Ada R. was experiencing mental stress and anxiety and did not have the patience to take care of the child's needs. Ms. Peck further testified that Ada R. had told her that she had shaken and slapped Micah and put her hands around his throat. Ms. Peck was also concerned that Ada R. was not capable of remembering to give Micah the several different medications he was taking for his illness.[4] Ms. Peck explained that at times Ada R. had forgotten to give Micah his medication and that she once gave him the wrong dosage.

JoAnn Gibson, case manager for Timberline Health Group, the agency providing social services to Ada R. in connection with the voluntary placement, testified that on one occasion she observed red marks on Micah's arms and legs. She said that Micah was crying, and he told her that his mother had hit him. Ada R. later admitted that she had hit Micah on the leg with a ruler. Ms. Gibson also testified that once, she had witnessed Ada R. slamming Micah down on the bed when she was changing his diaper. However, Ms. Gibson indicated that Ada R.'s attitude towards Micah had improved dramatically within the past three weeks. She also stated that Ada R. performed household chores well.

Nancy Jones, a support specialist with Timberline Health Group, testified that Ada R. was showing much more patience with

---

1. We follow our traditional practice in cases involving sensitive facts and use initials to identify the parties rather than their full names. *See In re Jonathan P.,* 182 W.Va. 302, 303, n. 1, 387 S.E.2d 537, 538, n. 1 (1989).

2. Micah R. was diagnosed with perinatally acquired HIV infection shortly after his birth on January 4, 1994.

3. Ada R. and Hansel R. were divorced on December 13, 1995.

4. The record indicates that Micah takes five different medications several times per day. He also takes other medication on an as needed basis. It is critical that these medications be administered to Micah at the specified times and coordinated with his meals.

Micah. She had worked with Ada R. since September 1996. She stated that Micah never exhibited any actions suggesting that he was afraid of his mother. She also testified that she only had to remind Ada R. once during the last three months to give Micah his medication.

Ada R. testified that she was feeling much stronger and was having less medical complications with her illness. She said that she loved her son very much and wanted him returned to her. Ada R.'s sister testified that she felt that Ada R. was capable of taking care of Micah and that if she needed help, her family was available.

Based on the foregoing testimony, the judge deferred making a ruling until the guardian ad litem had time to submit a recommendation. On June 25, 1997, the guardian ad litem filed a recommendation stating that it was in the best interests of the child to have any decision as to termination of parental rights held in abeyance. Recognizing the expediency requirement of termination proceedings,[5] the guardian ad litem explained that he did not feel that the case was mature for a decision given the nature of Ada R.'s illness. The guardian ad litem recommended that Micah remain in foster care and that Ada R. be granted increased and liberal visitation.

In October 1997, Ada R. requested that the circuit court hold a supplemental termination hearing. In response, the Department filed a court summary which outlined problems that the Department was having with Ada R. regarding visitation and the treatment plan. The report indicated that Ada R. had become verbally aggressive and was alienating the people who were working with her. The Department was also aware that Ada R. had attended some support group meetings where she stated that Micah had been taken away from her for no reason. The report further indicated that Ada R. continues to tire easily, sleeps a lot, and complains of dizziness. The Department did not believe that Ada R. was capable of administering Micah's medication properly or providing his meals. Thus, the Department recommended that Ada R.'s parental rights

be terminated, but that she be granted post-termination visitation.

The supplemental termination hearing was held on October 14, 1997. Following additional testimony by Ms. Peck and Ada R., the guardian ad litem recommended termination of Ada R.'s parental rights. As reflected in the final order, Ada R.'s parental rights were terminated, but she was afforded post-termination visitation of two hours per week.

## II.

In Syllabus Point 1 of *In the Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996), we set forth the standard of review for abuse and neglect cases:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

*See also* Syllabus Point 4, *In the Matter of Taylor B.*, 201 W.Va. 60, 491 S.E.2d 607 (1997); Syllabus Point 1, *State ex rel. Diva P. v. Kaufman*, 200 W.Va. 555, 490 S.E.2d 642 (1997).

As her first assignment of error, Ada R. contends that the evidence of abuse is so weak that it does not meet the definition of abuse as set forth in the statute, especially considering that Micah was never removed from her home. Ada R. does admit to strik-

---

5. *See W.Va.Code* 49–6–2(d) (1996).

ing Micah with a ruler once and shaking him, but she states that these incidents were minimal and occurred at a time when she was under a great deal of stress. She further contends that there is no evidence that she neglected her son. At the time of the termination hearings, she had been properly administering Micah's medication and had the support of her family to help with his care.

*W.Va.Code* 49–1–3(a)(1) (1994) defines an "abused child" as' a child who is harmed or threatened by "[a] parent, guardian or custodian who knowingly or intentionally inflicts, attempts to inflict or knowingly allows another person to inflict, physical injury or mental or emotional injury, upon the child or another child in the home[.]" A "neglected child" is defined by *W.Va.Code* 49–1–3(g)(1)(A) as a child "[w]hose physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent, guardian or custodian to supply the child with the necessary food, clothing, shelter, supervision, medical care or education, when such refusal, failure or inability is not due primarily to a lack of financial means on the part of the parent, guardian or custodian[.]"

The evidence in the record shows that Ada R. has experienced difficulties in properly administering Micah's medications which are crucial to his health. At times, she has forgotten to give him the medicine, and at least once, she administered the wrong dosage. In addition, Ada R. has admitted to striking her child with a ruler and slapping and shaking him on other occasions. These incidents clearly fit within the statutory definitions of abuse and neglect. Therefore, the circuit court did not err in finding Micah was an abused and neglected child.

Ada R. next contends that the circuit court erred in terminating her parental rights. In this regard, she argues the evidence did not support the circuit court's finding that there was no reasonable likelihood that the conditions of abuse and neglect could be corrected in the future. She asserts that even with the current knowledge about AIDS, it is difficult to project the progression of the disease on an individual basis. She further asserts that the evidence shows that she has become stronger and is under less stress indicating that any such conditions of abuse or neglect could be corrected.

■ *W.Va.Code* 49–6–5 (1996) governs the dispositional phase of abuse and neglect proceedings. Several dispositional alternatives are set forth in the statute with precedence given to the least restrictive alternative appropriate under the circumstances. With respect to these statutory provisions, we have held that:

'As a general rule the least restrictive alternative regarding parental rights to custody of a child under *W.Va.Code*, 49–6–5 [1977] will be employed; however, courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years old who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and physical development retarded by numerous placements.' Syl. pt. 1, *In re R.J.M.*, [164] W.Va. [496], 266 S.E.2d 114 (1980).

Syllabus Point 1, *In the Interest of Darla B.*, 175 W.Va. 137, 331 S.E.2d 868 (1985). *See also* Syllabus Point 7, *In the Interest of Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991). We have further held that:

Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, *W.Va.Code*, 49–6–5 [1977] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under *W.Va.Code*, 49–6–5(b) [1977] that conditions of neglect or abuse can be substantially corrected.

Syllabus Point 2, of *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980). *See also* Syllabus Point 7, *In re Katie S. and David S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996).

■ *W.Va.Code* 49–6–5(b) defines "no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected" as "based upon the evidence before

the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse and neglect, on their own or with help." Pursuant to the statute, such conditions are deemed to exist in certain circumstances. For instance, if the abusing parent willfully refused or is presently unwilling to cooperate in the development of a family case plan, a finding of "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected" under the statute is warranted.[6] Likewise, the same finding is appropriate when the abusing parent has repeatedly or seriously injured the child physically or emotionally.[7] Arguably, both of these circumstances exist in the case *sub judice.* However, it appears that the principal reason that the circuit court terminated Ada L.'s parental rights is the tragic fact that she is suffering from a terminal illness.

▮ The evidence in the record indicates that although Ada R.'s health and emotional state did improve somewhat after she initially placed Micah in foster care, by the time the supplemental termination hearing was held, her health had once again declined.[8] She was tiring easily, sleeping a lot, complaining of dizziness, and suffering from occasional memory loss. Ms. Peck indicated that Ada R. was no longer capable of giving Micah his medication as prescribed or preparing his meals as needed. In addition, Ms. Peck stated that at times, Ada R. believed that Micah had been cured. In fact, Ada R. testified at the hearing on October 14, 1997, that she believed Micah would be "healed." Ada R. further testified that after a two-hour visitation with Micah, she became very tired.

Given this evidence, the circuit court did not err in finding that there was no reasonable likelihood that the conditions of abuse and neglect could be substantially corrected in the future. However, we are troubled by the circuit court's conclusion that termination of Ada. R's parental rights was warranted.

This case illustrates the horrible crisis situation confronting many single custodial parents who are suffering from AIDS or some other terminal disease. Sadly, these parents must find someone to take care of their children once they are no longer able to do so. Unfortunately, traditional guardianship law presents only two choices. In order to formally grant another person parental authority while the parent is still living, the parent must relinquish his or her own authority. Testamentary guardianship, the second option, only becomes effective upon the parent's death.

Several states have begun to offer a third alternative by adopting stand-by guardianship statutes.[9] Generally, standby guardianship statutes allow parents who are at a substantial risk of becoming ill or disabled within a limited time period to select a "standby guardian" to take care of their children at the point when they become too ill or disabled to care for them. The parent does not relinquish any of his or her authority, but instead shares it with the standby guardian. Additionally, the parent may end the standby guardian's authority when he or she chooses to do so.[10]

If the opportunity to choose a "standby guardian" had been available to Ada R., she

---

6. *W.Va.Code* 49–6–5(b)(2) provides: "The abusing parent or parents have willfully refused or are presently unwilling to cooperate in the development of a reasonable family case plan designed to lead to the child's return to their care, custody and control[.]".

7. *W.Va.Code* 49–6–5(b)(5) provides: "The abusing parent or parents have repeatedly or seriously injured the child physically or emotionally, or have sexually abused or sexually exploited the child, and the degree of family stress and the potential for further abuse and neglect are so great as to preclude the use of resources to mitigate or resolve family problems or assist the abusing parent or parents in fulfilling their responsibilities to the child[.]"

8. We also note that since this appeal was filed, Ada R. has been hospitalized at least twice.

9. *See e.g.,* Cal.Prob.Code § 2105(f) (West Supp. 1998); Conn.Gen.Stat.Ann. §§ 45a–624–624(g) (West Supp.1998); Md.Code Ann.Est. & Trusts §§ 13–901–908 (Supp.1991); N.Y.Surr.Ct.Proc.Act Law § 1726 (McKinney 1996).

10. *See* Deborah Weimer, *Implementation of Standby Guardianship: Respect for Family Autonomy,* 100 Dickinson L.Rev. 65 (1995); Joyce McConnell, *Standby Guardianship: Sharing the Legal Responsibility for Children,* 7 Md.J.Contemp.Legal Issues 249 (1995–96). .

might well have taken advantage of it.[11] The record indicates that Ada R. has expressed a desire throughout this case that the foster parents currently providing for Micah's care eventually be able to adopt him, and apparently, they want to do so. In fact, at one point, Ada R. wanted to proceed with the adoption. However, she decided she could not give up her child and changed her mind.

Ada R.'s heartbreaking struggle to deal with her disease, while, at the same time, not turning her back on her child makes this abuse and neglect case all the more tragic. By doing what she felt was best and voluntarily placing Micah with the Department, Ada R. has ended up not only fighting to remain alive, but also fighting to remain a parent. Unquestionably, she has suffered unbelievable emotional torment. While we certainly do not condone or ignore the physical abuse that Ada R. directed toward Micah and believe that the institution of abuse and neglect proceedings was proper, we find that the circumstances in this case simply do not warrant termination of parental rights. Through no fault of her own, Ada R. has been victimized by a disease which is stealing her life and seriously threatening that of her son. Although she is no longer able to take care of her son or provide for his needs, it is quite evident that Ada R. loves her son very much. In fact, the parental bond that Ada R. shares with her son may now be her only source of comfort.

What is done in this case regarding parental rights has the potential to be very far reaching. If the spread and growth of the AIDS virus remains unchecked, it will eventually touch all families, and then every family will have an Ada or a Micah. Of course, even absent AIDS, the same impossible dilemma is faced by some single parents who become profoundly disabled or who are slowly dying from cancer or other protracted terminal diseases. Would the law countenance terminating the parental rights of a parent dying from lung cancer or breast cancer, for example? We think not.

While we believe that termination of parental rights is not appropriate in this instance, the health, safety, and welfare of the child must continue to be our primary concern. In *In re Jeffrey R.L.*, 190 W.Va. 24, 32, 435 S.E.2d 162, 170 (1993), we recognized that the rights of the natural parents merit significant consideration, but "the best interests of the child are paramount." As discussed previously, the evidence in this case clearly indicates that Ada R. is unable to take care of Micah. He needs a stable home to provide him the special care that is required because of his medical condition. However, the evidence also indicates that there is a close and significant emotional bond between this parent and child. We refuse to compound the tragedy in this case further by forever severing this parent-child relationship.

However, we must also consider Micah's current placement. He is presently in a good home with foster parents who are providing him with love, care, support, and a nurturing environment in addition to attending to his medical needs. The foster parents' desire to adopt Micah clearly shows that they have established a strong emotional bond with him. Foster parents who are willing to assume such an awesome responsibility are extraordinary. It is not easy to find foster care placement for a child like Micah who is suffering from a severe disease, and it is even more difficult to find an adoptive home. Obviously, these foster parents need assurances that the adoption will be allowed to proceed in the future because they have made a substantial investment of emotional support and time.

*W.Va.Code* 49–2–14 (1995) does offer some protection for these foster parents. The statute provides:

> When a child has been placed in a foster care arrangement for a period in excess of eighteen consecutive months and the state department determines that the placement is a fit and proper place for the child to reside, the foster care arrangement may not be terminated unless such termination is in the best interest of the child and:
>
> (1) The foster care arrangement is terminated pursuant to subsection (a) of this

---

11. Unfortunately, our Legislature had not enacted standby guardianship statutes.

section;[12]

(2) The foster care arrangement is terminated due to the child being returned to his or her parent or parents;

(3) The foster care arrangement is terminated due to the child being united or reunited with a sibling or siblings;

(4) The foster parent or parents agree to the termination in writing;

(5) The foster care arrangement is terminated at the written request of a foster child who has attained the age of fourteen; or

(6) A circuit court orders the termination upon a finding that the state department has developed a more suitable long-term placement for the child upon hearing evidence in a proceeding brought by the department seeking removal and transfer. *W.Va.Code* 49–2–14(b). Although the record is unclear as to exactly how long Micah has been residing with the foster parents who desire to adopt him,[13] it appears that this statute will soon provide some assurances for them. Certainly, Micah's current placement is in his best interest.

■ Therefore, we hold that when a parent is unable to properly care for a child due to the parent's terminal illness, so that conditions which would constitute neglect of the child occur and continue to be threatened, termination of parental rights, without consent, is contrary to public policy, even though there is no reasonable likelihood that the conditions of neglect will be substantially corrected in the future. In such circumstances, a circuit court should ordinarily postpone or defer any decision on termination of parental rights. However, such deference on the parental rights termination issue does not require a circuit court to postpone or defer decisions on custody or other issues properly before the court. In fact, efforts towards locating prospective adoptive parents shall be made so long as every measure is taken to foster and maintain the bond and ongoing relationship between the parent and child.

Accordingly, for the reasons set forth above, the final order of the circuit court is reversed and this case is remanded to the circuit court. On remand, the circuit court shall develop a visitation plan workable for all parties to permit a continued relationship between Micah and his mother. Furthermore, the circuit court shall develop a permanency plan which will provide additional protection for Micah's foster parents by ensuring that they become the adoptive parents at the appropriate time.

Reversed and remanded.

WORKMAN, Justice, concurring:

(Filed June 23, 1998)

I write separately to emphasize that the circuit court on remand should not leave Micah's future in limbo. While he, as the majority points out, may be one of few remaining sources of solace and comfort for his mother in her terminal illness, the legal system must not take from Micah what could be the only source of continued commitment and nurturance (to which every child should have a right) that he might ever have. And as tragic a situation as Ada faces, a greater tragedy would be an HIV positive four-year-old child with no one to count on. The foster parents with whom he has lived for almost two years, and with whom he has bonded and

---

**12.** *W.Va.Code* 49–2–14(a) provides:

(a) The state department may temporarily remove a child from a foster home based on an allegation of abuse or neglect, including sexual abuse, that occurred while the child resided in the home. If the department determines that reasonable cause exists to support the allegation, the department shall remove all foster children from the arrangement and preclude contact between the children and the foster parents. If, after investigation, the allegation is determined to be true by the department or after a judicial proceeding a court finds the allegation to be true or if the foster parents fail to contest the allegation in writing within twenty calendar days of receiving written notice of said allegations, the department shall permanently terminate all foster care arrangements with said foster parents: Provided, That if the state department determines that the abuse occurred due to no act or failure to act on the part of the foster parents and that continuation of the foster care arrangement is in the best interests of the child, the department may, in its discretion, elect not to terminate the foster care arrangement or arrangements.

**13.** The record suggests that Micah may have been placed in another foster home at one time.

formed the mutual emotional attachment that results in real commitment, must know that they will be part of this child's permanency plan. That is something they deserve, but it is something that Micah deserves even more. As the majority points out, AIDS is a disease which, if not defeated, will eventually touch all of us. The pain and suffering that accompany this disease unfortunately leave many HIV positive children without permanent homes, and without parents willing to make the commitment to walk with these children on whatever road the disease takes them. It would be tragic indeed to take from Micah what could be his last chance for a permanent home.

I applaud the majority's suggestion that concurrent planning for permanency should occur even where parental rights are not terminated. This should be the practice in all abuse and neglect cases, so that there is a permanency plan for children where family reconciliation efforts are not successful for whatever reason.

It will be the task for the lower court on remand to see to it that Micah has a place to be, with people willing to make a permanent commitment. In the final analysis, however, it will be up to these two families to make it work for Micah. As we said in *Honaker v. Burnside*, 182 W.Va. 448, 388 S.E.2d 322 (1989),

> No matter how artfully or deliberately the trial court judge draws the plan for these coming months, however, its success and indeed the chances for ... [the children's] future happiness and emotional security will rely heavily on the efforts of these two ... [families]. The work that lies ahead for both of them is not without inconvenience and sacrifice on both sides. Their energies should not be directed even partially at any continued rancor at one another, but must be fully directed at developing compassion and understanding for one another, as well as showing love and sensitivity to the children's feelings at a difficult time in all their lives.

Id. at 452–53, 388 S.E.2d at 326–27.